545 A.2d 917

SHV COAL, INC.

v.

CONTINENTAL GRAIN CO., and Conticoal, a/k/a Conticoal Co., Conticoal, Inc., and Conticarriers & Terminals, Inc. and R. Stephen Kasey.

Appeal of: R. Stephen KASEY and Ralph L. Wingrove.

Appeal of: CONTINENTAL GRAIN CO., Conticoal and Conti Carriers & Terminals, Inc.

SHV COAL, INC.

v.

Ralph L. WINGROVE.

Appeal of: R. Stephen KASEY and Ralph L. Wingrove.

Appeal of: CONTINENTAL GRAIN CO., Conticoal and Conti Carriers & Terminals, Inc.

SHV COAL, INC., Appellant,

v.

CONTINENTAL GRAIN CO., and Conticoal, a/k/a Conticoal Co., Conticoal, Inc., and Conticarriers & Terminals, Inc. and R. Stephen Kasey, Appellees.

SHV COAL, INC., Appellant,

v.

Ralph L. WINGROVE, Appellee.

Superior Court of Pennsylvania.

Argued Jan. 28, 1988.

Filed June 27, 1988.

244

Errol S. Miller, Pittsburgh, for appellants in No. 858 and appellees in No. 905.

William W. Blessing, Indiana, for appellees in No. 858 and appellants in No. 905.

Before BROSKY, WIEAND and DEL SOLE, JJ.

WIEAND, Judge:

In this action to recover damages for breach of an agent's fiduciary duties, tortious interference with a prospective business relationship, and conspiracy, the trial court, sitting in equity, found that Ralph L. Wingrove, an employee of SHV Coal, Inc. (SHV), had diverted a coal contract to ContiCoal, a division of Continental Grain Company (hereinafter referred to as "Continental"), a competitor of SHV, and that Continental had been part of an unlawful conspiracy to accomplish this result. Therefore, the trial court awarded both compensatory and punitive damages to SHV against Wingrove and Continental. The trial court also denied Wingrove's counterclaim for a realtor's commission which SHV had agreed to pay when it requested Wingrove to move from Cincinnati, Ohio, to Indiana, Pennsylvania. Post-trial motions were denied, and cross-appeals were filed by all parties. They have raised numerous issues which we will review seriatim. First, however, an examination of the facts found by the trial court is essential to an understanding of the issues raised on appeal.

## I. The Facts

SHV, a division of SSM Coal of the Netherlands, is engaged in the coal brokerage business, with headquarters in Cincinnati, Ohio. In 1982, SHV made plans to open an office in Indiana, Pennsylvania, to serve as a regional base from which to serve its customers in the northeastern United States. Wingrove, who had joined SHV in 1980, was persuaded to move from Cincinnati to Indiana and become sales manager for its northeastern regional office. In addition to a substantial increase in salary, SHV promised Wingrove that it would pay the realtor's commission which he would incur upon the sale of his home in Cincinnati and would reimburse him for his moving expenses.

The regional office in Indiana, Pennsylvania, appeared to be a success. Wingrove, who had been engaged in the coal brokerage business in Indiana before joining SHV in 1980, had developed prior business contacts which he was able to utilize, and these contacts, together with the acquisition of

new customers, contributed to the success of SHV's regional office in Pennsylvania. After he began his duties in Pennsylvania, Wingrove entered into negotiations with representatives of Eastman–Kodak Company (Kodak), a long-standing customer of SHV, regarding Kodak's coal needs for its plant at Rochester, New York. As negotiations proceeded, Wingrove advised his superiors that a contract would be concluded shortly. On April 6 and 7, 1983, Wingrove met with Kodak's purchasing agent in Rochester, New York, to finalize the agreement. Kodak's purchasing agent was prepared to issue to SHV a purchase order for the coal needed by Kodak at its plant in Rochester. Wingrove then told Kodak's agent that he, Wingrove, intended to leave SHV's employ and take a position with Continental. Wingrove also implied that SHV was planning to close its regional office in Pennsylvania. He told Kodak that he would not accept Kodak's purchase order on behalf of SHV but that, if it were satisfactory to Kodak, he would accept it on behalf of Continental.

In fact, Wingrove had accepted, on April 6, an offer to join Continental and manage its regional office, also located in Indiana, Pennsylvania, effective April 11. He did not notify SHV of this until April 7, when he formally resigned his managerial position, effective April 15. On April 12, Kodak issued a purchase order for coal from Continental, which Wingrove accepted on Continental's behalf. Kodak had not previously done business with Continental.

The efforts by Continental to persuade Wingrove to change employment had been conducted over a period of approximately two months. They entailed numerous telephone conversations—Wingrove had been given a Continental credit card to use when calling Continental's offices—as well as face-to-face negotiations. During the same period, Continental was also attempting to recruit Stephen Kasey, another SHV employee. When SHV learned that Kasey had been engaged in negotiations with Continental, it termi-

nated his employment.[1]

## II. The Standard of Review

■ The scope of appellate review on appeal from an equity decree is limited, and is confined to a determination by the appellate court of such questions as (1) whether the findings of the trial judge are supported by sufficient evidence; (2) whether the factual inferences and legal conclusions based on the judge's findings are correct; (3) whether there was an abuse of discretion; and (4) whether there was an error of law.

16 Std.Pa.Prac.2d § 91:155. The test employed is not whether the judges of an appellate court would have reached the same result as the trial judge, who heard and saw the evidence, but whether a judicial mind, on due consideration of the evidence, could reasonably have reached the conclusion of the trial judge. See: *Yuhas v. Schmidt*, 434 Pa. 447, 454, 258 A.2d 616, 619–620 (1969); *Masciantonio Will*, 392 Pa. 362, 367, 141 A.2d 362, 365 (1958). See also: 16 Std.Pa.Prac.2d § 91:155. After a careful and thorough review of the extensive and voluminous record in the instant case, we are satisfied that the findings of fact and the inferences drawn therefrom are supported by competent evidence. We are also satisfied that the trial court did not err in determining that Wingrove had breached his duties of loyalty to SHV and that both Wingrove and Continental, as conspirators, were liable to SHV for interfering with SHV's prospective business relationship with Kodak.

## III. SHV's Right to Recover

■ "There can be no doubt that an agent owes a duty of loyalty to his principal, and in all matters affecting the subject of his agency, he must act with the utmost good

1. SHV also joined Kasey in its action against Continental and Wingrove. The trial court, however, found in Kasey's favor and on his counterclaim awarded him damages in the amount of $4,700.00 to reimburse him for moving expenses and a realtor's commission on the sale of his residence in Cincinnati which SHV had agreed to pay upon his relocation from Cincinnati to SHV's southeastern regional office in Roanoke, Virginia. Kasey is not a party to this appeal.

faith in the furtherance and advancement of the interests of his principal." *Sylvester v. Beck,* 406 Pa. 607, 610, 178 A.2d 755, 757 (1962). See also: 1 P.L.E. Agency § 32. Every agent "is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed." Restatement (Second) of Agency § 394. He is "subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement (Second) of Agency § 387. No man can serve two masters. *Onorato v. Wissahickon Park, Inc.,* 430 Pa. 416, 422, 244 A.2d 22, 25 (1968), citing Matthew 6:24. An agent is a fiduciary with respect to matters within the scope of his agency and is required to act solely for the benefit of his principal in all matters concerned with the agency. *Onorato v. Wissahickon Park, Inc., supra,* 430 Pa. at 423, 244 A.2d at 26; 1 P.L.E. Agency § 32.

■ The trial court concluded that Wingrove had breached his duty of loyalty to SHV. We agree. While employed by SHV, Wingrove set out to divert business, which he was being paid to acquire for SHV, to a competitor with whom he had agreed to accept employment. This he did without any knowledge or consent by his employer, who was not even aware that he was contemplating other employment. This was a clear violation of Wingrove's duty of loyalty, for which he was liable in damages. See: Restatement (Second) of Agency §§ 400, 401.

■ Wingrove and Continental were also liable for interfering with SHV's prospective business relations with Kodak. It is well-settled that one who interferes with a prospective business relationship of another is liable for the harm caused thereby. In *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895 (1971), the Supreme Court observed:

Interference with a prospective contractual relation is a tort long recognized at common law. It is formulated thusly in the Restatement of Torts, § 766: "... one who, without a privilege to do so, induces or otherwise pur-

posely causes a third person not to ... (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby."

The courts of this Commonwealth have accepted and applied § 766 in a variety of situations, but apparently not heretofore in the area of prospective as distinguished from presently existing contractual or business relations. In *Glazer v. Chandler*, 414 Pa. 304, 307, 308, 200 A.2d 416 (1964), however, this Court indicated that recovery in tort would be allowed for interference with prospective contracts or business relations of third parties with a plaintiff. We see no reason whatever why an intentional interference with a prospective business relationship which results in economic loss is not as actionable as where the relation is presently existing, although we recognize that there well may be more difficult problems of proof in the latter situation.

*Id.*, 441 Pa. at 477–478, 272 A.2d at 897 (footnotes omitted). The four elements of a cause of action for intentional interference with prospective contractual relations are:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466, 471 (1980) (footnote omitted). Although anything that is prospective is necessarily uncertain and although the term "prospective contractual relations" eludes precise definition, the law holds that a principal may recover when the factfinder is satisfied that but for the wrongful acts of the defendants it is reasonably probable that a contract would have been entered. See: *Glenn v. Point Park College*, *supra*, 441 Pa. at 480–481, 272 A.2d at 898–899.

The evidence in the instant case demonstrated clearly that there was a prospective business relationship between SHV

and Kodak. When Wingrove met with Kodak's purchasing agent in early April, 1983, Kodak, which was a regular customer of SHV, was prepared to issue a purchase order to SHV for Kodak's coal needs at its plant in Rochester. Nevertheless, Wingrove intentionally interfered with the consummation of the agreement by diverting the order to Continental. To accomplish this diversion, Wingrove went so far as to represent that SHV intended to close its regional office in Pennsylvania.

Because Wingrove's employment by SHV was terminable at will, Continental could recruit him without fear of liability to Wingrove's employer. However, it could not induce Wingrove to leave his employment with SHV for the purpose of having Wingrove entice away SHV's customers. As the Supreme Court stated in *Albee Homes, Inc. v. Caddie Homes, Inc.*, 417 Pa. 177, 182, 207 A.2d 768, 771 (1965):

> In the first place, the offering of employment to a person under a contract, terminable at the will of either, with another is not actionable in and of itself: *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1957); *Harley & Lund Corp. v. Murray Rubber Co.*, 31 F.2d 932 (2d Cir.1929); and, *Triangle Film Corp. v. Aircraft Pictures Corporations*, 250 Fed. 981 (2d Cir.1918). As stated in *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. at 633–634, 136 A.2d at 847: "The systematic inducing of employes to leave their present employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employes. *So also, when the inducement is made for the purpose of having the employes commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection.*" (emphasis added.)

The trial court could find from the evidence in this case that Wingrove was acting at the behest of Continental when he diverted the Kodak coal contract from SHV to Continental. Moreover, the evidence is unequivocal that Continental, with knowledge of the conduct of its agent, accepted and retained the benefits of the wrongfully diverted Kodak contract. Under these circumstances, Continental's liability to SHV was established.

## IV. Damages

### A. *Compensatory Damages*

The trial court awarded compensatory damages to SHV in the amount of $31,200.00. In making this award, the trial court determined that the conduct of Wingrove and Continental had deprived SHV of profits at the rate of five thousand ($5,000.00) dollars per month for a period of six months. The court also determined that SHV was entitled to be reimbursed for wages and expenses paid to Wingrove in the amount of one thousand, two hundred ($1,200.00) dollars during the time when Wingrove was, in fact, negotiating the Kodak contract on behalf of Continental. All parties have appealed from the court's award of damages. SHV contends that the trial court erred in its determination that SHV was entitled to recover lost profits for a period of only six months. Wingrove and Continental contend that the trial court's award of lost profits is not supported by the evidence.

As a general rule, damages need not be proved with mathematical certainty. Nevertheless, sufficient evidence must be produced so that a court can arrive at an intelligent estimate without conjecture. See: *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 119, 464 A.2d 1243, 1257–1258 (1984). The plaintiff bears the burden of proving damages by a fair preponderance of the evidence. *Id.*, 318 Pa.Superior Ct. at 118, 464 A.2d at 1257. Loss of profits are recoverable upon proper proof both in contract and tort cases. *Id.*, 318 Pa.Superior Ct. at 120, 464 A.2d at 1258. The amount of such damages is an issue of

fact to be decided by the factfinder. *Id.*, 318 Pa.Superior Ct. at 117, 464 A.2d at 1257. See also: *Glomb v. Glomb,* 366 Pa.Super. 206, 216, 530 A.2d 1362, 1368 (1987); *Simmons v. Mullen,* 231 Pa.Super. 199, 214, 331 A.2d 892, 900 (1974). The factfinder's determination of damages "should not be interfered with unless it clearly appears that the amount awarded resulted from partiality, caprice, prejudice, corruption or some other improper influence." *Delahanty v. First Pennsylania Bank, N.A., supra* 318 Pa.Super. at 117, 464 A.2d at 1257.

■■■ At trial, SHV produced expert opinion evidence in support of its contention that its business relationship with Kodak would have continued for a period of five years if it had not been wrongfully interferred with by Wingrove and Continental. The trial court rejected this testimony and found that a period of six months was more realistic. This was primarily because of the nature of the coal brokerage business which depended largely upon personal interaction between the broker's salesman and the customer. In this case, the evidence was that Kodak's business was dependent upon and was intended to be given to Wingrove. Thus, Kodak's representative testified:

In our associations with suppliers and and we have thousands of them, that generally we try to nurture a relationship not only with the sales representative but also with members of top management that we do business with. From my conversations with my predecessor and looking in the file there had been no conversation or contact or no support from upper management from the firm of SHV. In addition to that from my discussions with my predecessor and the limited brief meeting that I had with Ralph, we felt that he was a representative that we would like to do business with as a coal representative and many times whether it is a manufacturer representative or broker we end up relying on that individual per se so based on those decisions I felt that we were leaning to be serviced by Ralph Wingrove at this particular time and in the future.

Because of the nature of the coal brokerage business and because of Kodak's relationship with Wingrove, the trial court determined that Kodak's coal business would not have been controlled by SHV for more than six months after Wingrove's departure. This finding is supported by the evidence, and SHV has demonstrated no valid reason for a reviewing court to interfere therewith.

In computing SHV's lost profits, the trial court multiplied the gross tonnage to be sold by the gross margin of profit per ton[2] and deducted therefrom the fixed costs and the transaction costs. SHV argues that it was error to subtract fixed costs such as rent, cost of utilities, and the cost of salaried employees. We are constrained to agree.

■ It is well-settled that fixed overhead costs are not properly deductible from the plaintiff's lost profits. See: *Jessup & Moore Paper Co. v. Bryant Paper Co.*, 297 Pa. 483, 147 A. 519 (1929); *Burd v. Campbell Hosiery Co.*, 150 Pa.Super. 367, 28 A.2d 365 (1942). These costs are constant in character and would not have been affected by the Kodak purchase order. Because SHV's fixed overhead expenses would not have been increased if the Kodak contract had been performed by SHV, they cannot be used to reduce the damages recoverable by SHV. This was more fully explained by the Supreme Court in *Jessup & Moore Paper Co. v. Bryant Paper Co., supra,* as follows:

> The plaintiff was entitled to such gain as would have accrued had the contract been completed (*Dravo Contracting Co. v. Rees & Sons,* 291 Pa. [387] 393 [140 A. 148, 151]), and an allowance must be made for such loss: Sales Act, May 19, 1915, P.L. 543. "The law does not require absolute certainty as to the data upon which profits are to be estimated, but certainty to a reasonable degree or extent so that the damages may rest upon a definite basis and not wholly in speculation and conjecture": *Wilson v. Wernwag,* 217 Pa. 82, 95 [66 A. 242]. In determining this amount, the expense which the seller

---

2. The gross margin is the difference between the selling price of each ton of coal and the cost of purchasing the same ton of coal from the supplier.

would have incurred in producing the manufactured article must be considered, and the record in the present case shows it was.  There was no additional labor required, nor would any depreciation in the machines used have resulted, if the soda pulp had been made, and the value of the by-products obtained from the making of the pulp was deducted from the damages claimed.  The overhead expenses, which defendant insists should be added as a cost of manufacture, were constant in character, and would not have been affected by the performance of the additional work.  There was no proof that these necessary corporate costs would have increased had the Bryant contract been completed, and such sums cannot therefore be used to reduce the damage allowable: *Morrow Smith Co. v. Cleveland T. Co.*, 296 Pa. 377 [145 A. 915]; *Stevenson v. Smith*, 82 Pa.Superior Ct. 539; *Huskey Mfg. Co. v. Friel–McLeister*, 84 Pa.Superior Ct. 328.  The expenditures with which the plaintiff was charged by the court below were not necessarily incident to the carrying out of the contract entered into, as in *Rantoul Co. v. Claremont Paper Co.*, 196 F. 305; *Klingman v. Racine–Sattley Co.*, 149 Ia. 634, 128 N.W. 1109; *Detroit Fire Proofing Tile Co. v. Vinton Co.*, 190 Mich. 275, 157 N.W. 8, and other like cases which might be cited.

The defendant was entitled only to a deduction for cost which would necessarily have been incurred in the performance of the contract.  The seller was entitled to be reimbursed for his loss, which is not to be decreased by subtracting charges necessarily involved in the general operation of its business, whether producing 90 or 100%.

*Id.* at 494–495, 147 A. at 524.

■ In the instant case, the profits which SHV lost by virtue of the interference with its prospective business relationship with Kodak must be determined by the margin on each ton of coal which would have been sold, reduced by the transactional costs.  Inasmuch as the sale will not be completed, the transactional costs will not be incurred, and SHV's profits must be reduced accordingly.  See: 22 Am. Jur.2d Damages § 178.

The evidence showed that SHV's margin on each ton of coal which it would have sold to Kodak was $1.75. The transactional costs in selling each ton of coal would have been thirty ($.30) cents per ton. Therefore, SHV's lost profits were measurable at the rate of $1.45 per ton. Nevertheless, we are unable to complete the computation of SHV's lost profits. The trial court has not made a finding regarding the amount of coal which would have been sold to Kodak during the six month period. Upon remand, the trial court should complete its computation of the lost profits which SHV is entitled to recover.

■■■■ The trial court determined that Wingrove's disloyalty to SHV had commenced on April 6, 1983, when he spirited away the Kodak purchase order. Therefore, the court held that SHV was entitled to recover the salary and expenses paid to Wingrove for the period between April 6, 1983 and April 15, 1983, the effective date of his resignation. SHV argues that Wingrove's disloyalty had commenced as early as March 2, 1983 and that it should therefore be allowed to recover additional salary and expenses paid to him. We reject this argument. The evidence supports the trial court's determination.[3]

### B. *Punitive Damages*

■■■■■ "Unlike compensatory damages, which have as their purpose the desire to make the plaintiff whole, the purpose of imposing punitive damages is to punish wrongdoers and to deter future conduct." *Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 579, 517 A.2d 1270, 1276 (1986). Although punitive damages are not generally recoverable in an action for breach of contract, they may be recovered in an action for tortious interference with prospective business relations. See: *Stroud v. Smith*, 194 Pa. 502, 45 A. 329 (1900). In order for such damages to be awarded, however, there must be shown "not only legal malice, but an actual malicious intent

---

**3.** We also find no abuse of discretion in the trial court's rejection of SHV's claim for reimbursement of administrative expenses incurred after the departure of Wingrove.

to injure." *Stroud v. Smith, supra,* 194 Pa. at 510, 45 A. 329. See also: *Golomb v. Korus,* 261 Pa.Super. 344, 347, 396 A.2d 430, 431 (1978). Punitive damages "are proper when the act which creates actual damages also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights." *Delahanty v. First Pennsylvania Bank, N.A., supra* 318 Pa.Super. at 129, 464 A.2d at 1263. See also: *Golumb v. Korus, supra* 261 Pa.Super. at 347, 396 A.2d at 431. However, they are not to be awarded merely because the defendant has committed a tort by interfering with another's prospective business relations. See: *Delahanty v. First Pennsylvania Bank, N.A., supra* 318 Pa.Super. at 130, 464 A.2d at 1263.

In the instant case, the trial court awarded punitive damages against both Wingrove and Continental because of their manipulative diversion of the Kodak purchase order, because of Continental's attempt to spirit away SHV's employees, and because Wingrove had misrepresented to Kodak that SHV intended to close its regional office in Pennsylvania. These acts the court found to be malicious and outrageous. Our review of the record, however, discloses that the conduct of Wingrove and Continental was no more egregious than that of any other employee who, at the instance of a new employer, disloyally intercedes with customers whom he or she has served in order to have them transfer their business to the new employer. Such conduct is tortious, and for such tortious conduct the law provides a remedy. That remedy is the award of compensatory damages. Without further outrageous and malicious conduct, however, the tortious interference with the business relations of an employer does not warrant the assessment of additional punitive damages. *Delahanty v. First Pennsylvania Bank, N.A., supra,* 318 Pa.Superior Ct. at 130, 464 A.2d at 1263. Because the record fails to disclose the outrageous and malicious conduct necessary to sustain further punishment in the nature of punitive damages, the award of punitive damages will be vacated.

## V. Wingrove's Counterclaim for Moving Expenses

When SHV asked Wingrove to move from Cincinnati, Ohio, to Indiana, Pennsylvania, it agreed to pay the realtor's commission on the sale of his home in Cincinnati. This home was not sold until May 19, 1983, when it was sold for $71,500.00. The realtor's commission was $5,005.00. The trial court disallowed Wingrove's counterclaim for the amount of this commission. In the first place, the court held, Wingrove had resigned his employment with SHV on April 15, 1983, and SHV had paid him all that was due up to and including that date. The court found that

[a]ny promises which may have been made were premised upon Mr. Wingrove's further employment. The effect of Mr. Wingrove's resignation on April 15, 1983 was that in addition to severing his relation with plaintiff, he also released plaintiff from any promises to take future actions on his behalf.

SHV has not disputed its agreement to pay the realtor's commission. The parties are in disagreement, however, regarding the effect of Wingrove's resignation on April 15, 1983, prior to the payment of the realtor's commission incurred in the sale of Wingrove's home.

SHV's promise to pay the realtor's commission was in consideration for Wingrove's moving to Indiana, Pennsylvania, to become manager of SHV's regional office. There was no agreement that Wingrove would remain in SHV's employ for a specified period of time. His employment was at will. Wingrove did make the move requested by his employer and remained in Pennsylvania for seven and one-half months as manager of SHV's regional office. Thus, even if the agreement were to be interpreted to require Wingrove to remain in SHV's employ for a reasonable time, Wingrove provided the consideration and performed the condition upon which SHV's promise had been premised. SHV was not thereafter released from its agreement by Wingrove's resignation of his managerial position.

SHV's agreement to pay the realtor's commission incurred by Wingrove in the sale of his Cincinnati home, therefore, is enforceable, and Wingrove is entitled to recov-

er therefor on his counterclaim. The agreement between SHV and Wingrove, however, did not require SHV to compensate Wingrove because the price for his home in Cincinnati failed to equal its appraised value. This was Wingrove's risk, and it was not assumed by SHV. Negotiations between the parties regarding a guaranteed price may have been discussed, but there is no evidence that a final agreement was reached. Therefore, Wingrove is not entitled to recover for any loss realized on the sale of his home in Cincinnati.

## VI. Conclusion

As a reviewing court, we have accepted the findings of the trial court. The facts found by the trial court support its conclusion that Wingrove and Continental wrongfully interfered with SHV's prospective business relationship with Kodak. Because of this tortious interference, SHV is entitled to recover compensatory damages. It is not entitled to recover punitive damages. Because the trial court's findings are inadequate to permit a final determination of the compensatory damages which SHV is entitled to recover, we will remand to permit the trial court to recalculate those damages.

On the counterclaim filed by Wingrove, the record establishes as a matter of law that SHV is liable to reimburse Wingrove for a realtor's commission in the amount of Five Thousand Five ($5,005.00) Dollars.

Reversed and remanded for the entry of judgments consistent with the foregoing opinion. Jurisdiction is not retained.

DEL SOLE, J., files a concurring & dissenting statement.

DEL SOLE, Judge, concurring and dissenting:

I join the majority opinion in all respects except one. I would not reverse the award of punitive damages. The defendants in this case were found to have acted intentionally and I believe that the trial court properly set forth its basis for punitive damages in its opinion when it stated:

Mr. Wingrove's complete disregard of his duty of loyalty to SHV, his manipulative diversion of the Eastman Kodak at Rochester account, his dual employment with a competitor, his attempted and completed spiriting away of needed employees, his defaming the business reputation of SHV, and the taking of SHV customer lists to enrich himself and SHV's competitor, ContiCoal, were based on malice and were directed by ContiCoal. These acts were clearly outrageous and are the adequate basis for the Court to award punitive damages upon both Mr. Wingrove and ContiCoal.

I would find that the evidence in the record supports the findings and conclusions by the trial court.