J-A25038-17

2018 PA Super 315

| | |
|---|---|
| AMQUIP CRANE RENTAL, LLC AND MAXIM CRANE WORKS, L.P. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| CRANE & RIG SERVICES, LLC; A CRANE RENTAL, LLC; HARVEY RAY GRAHAM; KRISTIAN B. BRUU; ROBBIN O. RAINEY; AND THOMAS NEWELL | |
| Appellants | No. 871 EDA 2017 |

Appeal from the Order Entered February 10, 2017
In the Court of Common Pleas of Bucks County
Civil Division at No: 2016-06632

BEFORE: OTT, J., STABILE, J., and STEVENS, P.J.E.[*]

OPINION BY STABILE, J.:                          **FILED NOVEMBER 27, 2018**

Appellants Harvey Ray Graham, Kristian B. Bruu, Robbin O. Rainey, and Thomas Newell (collectively "the Individuals"), along with Appellants Crane & Rig Services, LLC ("C&R") and A Crane Rental, LLC ("ACrane"), appeal from a preliminary injunction prohibiting the Individuals from (1) working in the crane rental industry in limited geographic areas, (2) soliciting customers of Appellees Amquip Crane Rental, LLC ("AmQuip") and Maxim Crane Works, L.P. ("Maxim"), and (3) using AmQuip's confidential information. AmQuip employed the Individuals prior to their respective separations from that

---

[*] Former Justice specially assigned to the Superior Court.

employment. The Individuals joined a rival crane rental company, ACrane, until they were terminated concurrent with the entry of the preliminary injunction. In this appeal, the Individuals challenge the preliminary injunction on the grounds that (1) Newell did not breach his duty of loyalty to AmQuip; (2) the trial court made erroneous factual rulings; and (3) the court abused its discretion in enforcing noncompetition covenants that Graham, Bruu and Rainey entered into with AmQuip. We affirm.[1]

Appellees AmQuip and Maxim were acquired by a third party in July 2016 and are in the process of a formal operational merger. Together, they represent one of the largest crane companies in the world. AmQuip-Maxim[2] is a global crane rental company with approximately $700 million in annual revenue. It operates forty to fifty branch locations; employs more than 2,500 individuals; serves over 6,600 customers; has a fleet of over 1,200 cranes; and boasts the largest production crane in the world, which can lift approximately 3,100 tons. AmQuip is valued at roughly $1.4 billion. AmQuip

---

[1] Although C&R and ACrane have joined in this appeal, the trial court entered the preliminary injunction against the Individuals, not against either LLC. Accordingly, we affirm against C&R and ACrane on the ground that they lack standing to appeal. *See* Pa.R.A.P. 501 (only aggrieved parties may appeal); *In Re McCune*, 705 A.2d 861, 864 (Pa. Super. 1997) (to be "aggrieved party" entitled to appeal, party's interest in litigation must be adversely affected in manner which is both direct and immediate).

[2] For the sake of brevity, unless context requires greater specificity, we will refer to these entities together as "Amquip."

and Maxim maintain principal places of business in Trevose, Pennsylvania and Bridgeville, Pennsylvania, respectively.

In contrast, ACrane is a startup crane rental company with only 45 cranes. C&R is a crane financing company. Both companies are owned in equal shares by Christopher Anderson and William McCabe.

The Individuals, who range in age from their mid-fifties to mid-seventies, joined AmQuip between 2008 and 2013 and worked at AmQuip's Atlanta branch office. Graham was the branch manager of the Atlanta office, and Bruu, Rainey and Newell were salesmen. As a condition of employment, Graham, Bruu, and Rainey each signed noncompetition, nonsolicitation and confidentiality covenants with AmQuip. These covenants prohibited Graham, Bruu, and Rainey from competing with AmQuip and soliciting AmQuip customers or employees for two years after their employment with AmQuip. Newell did not sign any noncompetion, nonsolicitation or confidentiality covenants. All four Individuals, however, signed an AmQuip Employee Handbook that set forth a company confidentiality policy.

AmQuip's Atlanta branch was successful during the Individuals' tenure, and Newell, Bruu, and Rainey were outstanding salesmen. During the injunction hearing, there was ample evidence that AmQuip's resources and processes enabled the Individuals' to obtain new customers and increase revenue from customer relationships they had prior to joining AmQuip. Newell admitted that he gained new customers while at AmQuip through use of

AmQuip's resources. N.T., 1/25/17, at 45. AmQuip acquired two of its largest customers, Ansco and SAC Wireless, after Newell joined AmQuip in 2008; they did not come with him to AmQuip. Likewise, Rainey testified that "it was a good many customers that [he] began selling to for the first time after [he] began [his] employment with AmQuip[.]" N.T., 1/26/17, at 6-7.

The Individuals had access to confidential Amquip information, such as customer lists, customer order histories, vendor lists, pricing formulas, and branch financial information. Graham testified that he had access to the following information classified as confidential in AmQuip's Code of Business Conduct and Ethics: customer lists, customer usage histories, customer requirements, customer contact information, confidential pricing information, price quotations and bids made to specific customers and the customers' responses to those quotations and bids, pricing strategies, pricing and discount information unique to specific customers, information concerning the prospective crane rental needs of specific customers, business leads, confidential contractual rental terms, marketing strategies, business plans, information concerning equipment availability and allocation, information concerning employee compensation and incentives, financial information, and cost information. N.T., 1/24/17, at 66-67, Reproduced Record ("R.R.") at 191a. Graham admitted that AmQuip considered this information confidential and would not provide this information to competitors. N.T., 1/24/17, at 67. He also conceded that he "had a pricing formula for the [AmQuip] office" that

he did not share with anybody outside of AmQuip while he was employed there. *Id.* at 68. AmQuip's corporate office developed these pricing strategies, N.T., 1/26/17, at 94 and provided Graham with a customized dashboard that allowed Graham to access a range of customer and financial information for the AmQuip Atlanta branch, all of which Graham factored into his pricing formula. N.T., 1/27/17, at 5, "R.R." at 374a; N.T., 1/24/17, at 67-68. Graham used AmQuip customer information, supplier information, marketing plans and strategies, and "[c]orporate, financial and strategic information" on a daily or weekly basis. N.T., 1/24/17, at 165. Graham also admitted to having access to AmQuip's utilization reports, financials, and all of its client contracts for the Atlanta office. N.T., 1/24/17, at 165; N.T., 1/25/17, at 18.

Likewise, Newell had access to AmQuip's customer information, including their names and contact information from billing records, rental history, and pricing history. N.T., 1/25/17, at 45-47. He also had access to AmQuip's pricing information and bids. *Id.* at 46. Newell admitted that he had information regarding the prospective crane rental needs of particular customers and would not divulge such information to competitors. *Id.* at 46-47. He also acknowledged that AmQuip's pricing information "we talked about in our AmQuip Atlanta office was confidential." *Id.* at 50, 52. Bruu testified that he could access a wide variety of AmQuip's confidential information on its AS400 computer systems such as customer names, customer contact

information, customer requirements, billing information, and product information.

In July 2016, AmQuip and Maxim were both acquired by a third party. Subsequently, they have been merging into one operational entity. On August 11, 2016, Graham left AmQuip. The parties disagreed as to whether AmQuip terminated Graham or whether he resigned, but the trial court found that he resigned because he intended to join ACrane.

In August 2016, Graham met with Anderson and McCabe to discuss forming ACrane, a new crane rental company, in Atlanta. To set up ACrane, Anderson needed Graham's input on crane rental pricing to evaluate the feasibility of opening a new crane rental company in the Atlanta marketplace, and Graham admitted providing this information to Anderson. On Sunday, August 14, 2016, Anderson sent an email to McCabe with an attachment forecasting ACrane's opening in September 2016. In the body of the email, Anderson stated that he needed Graham's help in utilization, labor rates, billing rates, fuel cost and permit costs. Graham testified that he provided Anderson labor and billing rates. The email's attachment contained a forecast for branch profit and listed Graham and other persons as employees of the new company's Atlanta branch. On August 16, 2016, Graham met with Anderson and McCabe in Pittsburgh to make further plans for ACrane's Atlanta Office.

Bruu, Rainey and Newell, while still employed by AmQuip, assisted Graham in setting up the new business. On August 23, 2016, Newell emailed, from his AmQuip email address to his home email address, a quote template that AmQuip used. From his home, Newell forwarded the quote template to Judy Burns, AmQuip's then-billing manager and ACrane's future billing manager, who then emailed it to Bruu. ACrane used a quote form with its own name and logo on the top but with AmQuip locations, including its Trevose headquarters location, on the bottom.

In an email to Anderson and McCabe on Friday, September 2, 2016, Graham discussed recruitment of AmQuip employees and diversion of AmQuip customers and discussed how the other Individuals would either provide or need pickup trucks. More specifically, Graham discussed diverting AmQuip's largest customers to ACrane, particularly Service Electric, a significant customer of AmQuip's, having recently generated about $250,000 in revenue for AmQuip's Atlanta Branch Office with Newell overseeing the account. Graham also stated that ACrane needed to conduct contract reviews for Georgia Power and Pike Electric, customers who had recently paid an aggregate of $514,000 to AmQuip and were two of Rainey's major accounts. Graham revealed the Individuals' intention to hire all employees of AmQuip's Atlanta Branch Office and thus take over this office's customer base.

At Graham's invitation, Newell, Bruu and Rainey met McCabe and Graham at a restaurant in suburban Atlanta to discuss employment at ACrane.

On September 28, 2016, C&R sent an e-mail to Newell, Bruu and Rainey attaching new hire paperwork, including direct deposit forms. Within the next two days, Newell and Bruu completed this paperwork.

Prior to leaving AmQuip, the Individuals began diverting AmQuip customers to ACrane. Newell admitted that, while still employed by AmQuip, he told AmQuip's customers, including its largest Atlanta customer, Ansco, that a new crane rental company would be opening, and he offered to assist them in transferring their business to the new company. In September 2016, while still employed at AmQuip, Newell made arrangements for a contact he had at Ansco to introduce him to Lindsay Triplett, Ansco's vendor manager. On September 30, 2016, Newell forwarded Triplett an email from Graham attaching a Certificate of Insurance form and a W-9 form for ACrane, documents that a crane rental company needs to do business with a customer. Newell concluded his email by requesting Triplett to send the completed forms to him so that ACrane could begin servicing Ansco the following Monday.

On Friday, September 30, 2016, Newell sent an email to Graham, Bruu, Rainey, Burns, and Shannon Graham with the subject, "[p]roof read this & let me know bf I send this to everyone." N.T., 1/25/17, at 96-100. The email stated:

> Due to the merger of Amquip Crane Service & Maxim Crane I do not believe the service you have been accustomed to can be sustained {Maxim will be in charge of dispatch}. Effectively immediately I will be resigning from Amquip & joining with a new crane company along with all my colleagues & most of the operators you have become accustomed to working with. With

that being said I know there will be some transition difficulties & I assure you we will do this as fast & accurately as possible.

The name of the company is A Crane & We have at this time 10 cranes in town & many more coming this way. I do feel like this is the only way we can maintain the service we want to provide & you want to receive—I do appreciate the work you have in trusted to us over these many years & hope you will continue to allow us to do the same. We will do everything possible

ALL our telephone #'s will remain the same but we will have new Email addresses. {Effectively today any correspondence via email needs to come to our new emails}

R.R. at 76a. Bruu and Rainey, who were still working for AmQuip at that time, both responded: "Sounds good to me." N.T., 1/25/17, at 101.

On Sunday, October 2, 2016, Newell gave notice of his intent to resign the next day. On October 3, 2016, Newell wrapped up his affairs at AmQuip and deleted all business information from his AmQuip-issued computer. He then began sending AmQuip customers a modified version of the email that the other Individuals had approved. It stated:

Effective 10/2/16 I will no longer be working with Amquip crane service - Maxim Crane will be handling the day to day operation of the crane service & Under these circumstances I do not feel you will be able to receive the same quality of service that you have been receiving & we are used to providing.

We are in the process of making sure ALL your crane & rigging service will be handled to your complete satisfaction. Effective IMMEDIATELY any email's should come to this new address tomwnewell@outlook.com My tele.# is the same 770-653-3304.

R.R. 106a.

In just three months of operation during 2016, ACrane generated over $2,000,000 in sales in Atlanta and was projected to generate $10,000,000 in sales in its first year of operation.

On October 26, 2016, AmQuip filed an action against the Individuals alleging breach of contract, tortious interference with business relations, breach of common law duty of loyalty and civil conspiracy. Several weeks later, AmQuip filed a motion for preliminary injunction seeking to enjoin the Individuals from using confidential AmQuip business information and working for a competing crane rental company. The trial court held a four-day hearing on the injunction motion. In an opinion and order entered on February 10, 2017, the court entered the following preliminary injunction against the Individuals:

> a. [The Individuals] are hereby enjoined from engaging directly or indirectly in the crane rental business within the geographic territory serviced by the Atlanta, Georgia; Birmingham, Alabama; Mobile, Alabama; and Memphis, Tennessee branch offices of Amquip and/or Maxim Crane Works, L.P.;
>
> b. [The Individuals] are hereby enjoined from directly or indirectly soliciting, causing any person to solicit, or assisting in (*sic*) any other person in soliciting the employment of any person who is at the time of the solicitation, or who was within thirty (30) days of such solicitation, an officer or employee of AmQuip's;
>
> c. [The Individuals] are hereby enjoined from directly or indirectly soliciting, causing any other person to solicit, or assisting any other person with soliciting any customer or client of Amquip's to become a customer or client of any other company which directly or indirectly competes with Amquip;

d. [The Individuals] are hereby enjoined from utilizing, for any purpose, any confidential or proprietary business information of Amquip's or Maxim's; and

e. The injunction granted herein is effective immediately and shall remain in effect until further Order of Court.

f. Plaintiffs are directed to post of (*sic*) bond in the amount of $50,000[.00] within ten (10) days of the date of this Order.

Order, 2/10/17.

The Individuals filed a timely appeal to this Court and filed a timely statement of matters complained of on appeal. On May 9, 2017, the trial court issued a Pa.R.A.P. 1925 opinion that relied in part on its February 10, 2017 opinion and added supplemental analysis.

Appellants raise four issues in this appeal:

1. Whether the trial court's entry of a preliminary injunction as to [Newell] was proper, when Newell had no effective restrictive covenant and had no duty of loyalty to his prior employer that could be protected to prevent any resultant irreparable harm?

2. Whether the trial court was confronted with and fairly considered evidence sufficient to support the entry of a preliminary injunction as to Graham, Bruu, Rainey and Newell?

3. Whether the trial court properly entered a preliminary injunction against Graham, Bruu, Rainey, and Newell, despite decades of Pennsylvania case law suggesting that those parties engaged in no conduct justifying such entry?

4. Whether the trial court properly balanced the hardships of the parties in such a manner as to meaningfully consider the rights offended by the entry of a preliminary injunction?

Appellants' Brief at 4. Preliminarily, the trial court held that Pennsylvania law governs all substantive issues between the parties. Because none of the parties disputes this ruling, we will apply Pennsylvania law to this appeal.

To obtain a preliminary injunction, the moving party must prove six elements:

> 1) the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) greater injury would result from refusing an injunction than from granting it, and, concomitantly, issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, [it] must show that it is likely to prevail on the merits; 5) the injunction it seeks is reasonably suited to abate the offending activity; and, 6) that a preliminary injunction will not adversely affect the public interest.

**Hendricks v. Hendricks**, 175 A.3d 323, 330 (Pa. Super. 2017). In reviewing preliminary injunction orders, this Court must "conduct a searching inquiry of the record. Accordingly, . . . the scope of review in preliminary injunction matters is plenary." **Warehime v. Warehime**, 860 A.2d 41, 46 n.7 (Pa. 2004). Our standard of review is "highly deferential." **Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.**, 828 A.2d 995, 1000 (Pa. 2003). Under this standard, "[we do] not inquire into the merits of the controversy, but rather examine[] only the record to ascertain whether any apparently reasonable grounds existed for the action of the court below. We may reverse if the trial court's ruling amounted to an abuse of discretion or a

misapplication of law." ***Morgan Trailer Mft. Co. v. Hydraroll, Ltd.***, 759 A.2d 926, 932 (Pa. Super. 2000) (quotation omitted).

I.

In their first argument, the Individuals assail the entry of a preliminary injunction against Newell, the only Individual who did not enter into a written covenant not to compete with AmQuip. We hold that Newell breached his common law duty of loyalty to AmQuip by diverting AmQuip's customers to ACrane while still employed by AmQuip and inducing the other Individuals to breach the covenants not to compete that they entered into with AmQuip. Moreover, the trial court properly enjoined Newell from utilizing AmQuip's confidential information. We address each of these rulings *seriatim*.

*Newell's diversion of customers*. While still employed with AmQuip, Newell told AmQuip's customers that a new crane rental company would be opening, offered to assist them in transferring their business to the new company, and emailed Ansco, AmQuip's largest customer, about setting up the new company as a vendor. Ansco became a customer of ACrane.

Although Newell never formally entered into a covenant not to compete with AmQuip, his conduct still constituted a breach of his common law duty of loyalty. This Court has written:

> "There can be no doubt that an agent owes a duty of loyalty to his principal, and in all matters affecting the subject of his agency, he must act with the utmost good faith in the furtherance and advancement of the interests of his principal." ***Sylvester v. Beck***, [] 178 A.2d 755, 757 ([Pa.] 1962). ***See also:*** 1 P.L.E. Agency § 32. Every agent "is subject to a duty not to act or to

agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed." Restatement (Second) of Agency § 394. He is "subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement (Second) of Agency § 387. No man can serve two masters. **Onorato v. Wissahickon Park, Inc.,** [] 244 A.2d 22, 25 ([Pa.] 1968), citing Matthew 6:24. An agent is a fiduciary with respect to matters within the scope of his agency and is required to act solely for the benefit of his principal in all matters concerned with the agency. **Onorato v. Wissahickon Park, Inc.,** *supra* [], 244 A.2d at 26; 1 P.L.E. Agency § 32.

**SHV Coal, Inc. v. Continental Grain Co.**, 545 A.2d 917, 920-21 (Pa. 1988), *reversed on other grounds*, 587 A.2d 702 (Pa. 1991); **see also** Restatement (Second) of Agency, § 393, comment (e) ("After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. . . . He is not, however, entitled to solicit customers for such rival business before the end of his employment").

In **SHV Coal**, while employed by SHV, an employee set out to divert business, which he was being paid to acquire for SHV, to a competitor with whom he had agreed to accept employment. He did this without any knowledge or consent by SHV, who was not even aware that he was contemplating other employment. We held that this was "a clear violation of [the employee's] duty of loyalty." **Id.**, 545 A.2d at 921. Similarly, without AmQuip's knowledge or consent, and before leaving AmQuip, Newell induced AmQuip's customers to move their business to ACrane, a clear violation of his duty of loyalty.

- 14 -

Appellants rely erroneously on **PTSI, Inc. v. Haley**, 71 A.3d 304 (Pa. Super. 2013), for the proposition that Newell did not violate his duty of loyalty. In **PTSI**, two trainers who worked at a sports training facility (PTSI) decided to form their own training facility. The employees were at-will and not subject to any noncompetition, nondisclosure, or nonsolicitation agreements. They resigned from PTSI, leased space for their own facility, and informed PTSI clients that they were starting their own business. Soon thereafter, clients of PTSI began training at the new facility. PTSI filed an action against the former employees alleging breach of their duty of loyalty to PTSI. The trial court entered summary judgment against PTSI, and this Court affirmed. We upheld the trial court's conclusion that the trainers did not contact PTSI clients before they left PTSI. We continued:

> Even if Haley and Piroli did contact PTSI's clients while still employed by PTSI, PTSI presents no evidence that Haley and Piroli did so improperly. For example, text messages attached to PTSI's motion for summary judgment demonstrate that Piroli was circumspect and cautious in dealing with clients just days before resigning from PTSI.

*Id.* at 310. By observing that the trainers only sent "circumspect and cautious" text messages to the employer's customers prior to their departure, we implied that the trainers would have violated the duty of loyalty had they made pre-departure attempts to divert customers to their new company. That is what Newell did in this case, and that is the crucial distinction between this case and **PTSI**.

Appellants' reliance on **Socko v. Mid-Atlantic Systems**, 126 A.3d 1266 (Pa. 2015), is also misplaced. **Socko** held that an employment agreement containing a covenant not to compete may be challenged for lack of consideration even though the agreement expressly indicates that the parties "intend to be legally bound" pursuant to the Uniform Written Obligations Act—an issue unrelated to the present case. In passing, the **Socko** court mentioned that in the absence of an agreement between an employer and employee to the contrary, an employee may compete with his employer after terminating his employment. **Id.** at 1273. **Socko** did not address the issue of pre-departure solicitation that is at the center of this case.

*Newell's assistance to other Individuals in breaching their noncompetition covenants.* This Court's analysis in **Reading Radio, Inc. v. Fink**, 833 A.2d 199 (Pa. Super. 2003), is instructive on this subject. Kline, the station manager of a radio broadcasting company (WAGO), gave thirty days' notice of his intention to resign his position in order to accept a position at a rival broadcasting company (WEEU). Kline promised to work diligently during the thirty-day period to leave WAGO in better shape after he left than it had been before his departure. During the thirty-day period, however, the manager transferred a significant car dealership advertising account to defendant Reading Eagle, and he solicited his two best sales representatives to leave WAGO and join WEEU. The sales representatives were subject to noncompetition covenants; Kline was not. The sales representatives tendered

their resignations to Kline directly, who, although aware of the sales representatives' noncompetition covenants, did not attempt to enforce them. WAGO filed an action against Kline, WEEU, and the sales representatives alleging breach of their common law duty of loyalty, and the jury returned a verdict for damages against Kline and WEEU.[3]  This Court affirmed, reasoning:

> To prevail on a claim of breach of fiduciary duty of loyalty, a plaintiff must demonstrate that his agent acted for a person or entity whose interests conflicted with the plaintiff.  Restatement (Second) of Agency § 394 (1958). . . .The facts demonstrate that, while still employed by WAGO. . . . Kline actively engaged in diverting [the sales representatives] from WAGO to . . . WEEU, and he refused to enforce the covenants-not-to-compete to which they were bound. . . . Kline's failure to protect the integrity of the covenants-not-to-compete and the sales staff at WAGO were clear violations of his duty of loyalty[.]

*Id.* at 211.

Like the station manager in *Fink*, Newell breached his duty of loyalty by helping other AmQuip employees—Graham, Bruu and Rainey—breach their own noncompetition covenants by leaving AmQuip and joining ACrane.  The evidence demonstrates that before Bruu and Rainey left AmQuip, they convened with Newell to meet ACrane's principals to discuss employment at AmQuip.  And before leaving AmQuip, Newell forwarded AmQuip's price template to an intermediary, who in turn forwarded it to Bruu.

*Newell's use of and access to AmQuip's confidential information.*  The fourth provision of the preliminary injunction order precluded Newell from

---

[3] The parties stipulated to judgment against the sales representatives in the amount of $1.00, and the claims against them were satisfied.

utilizing AmQuip's confidential business information. Appellants argue that Newell did not steal AmQuip's trade secrets before or during his departure to ACrane. We conclude that the court properly entered this provision against Newell, because there was sufficient evidence that Newell sent some of AmQuip's confidential information to ACrane, had access to other confidential information, and, if left unchecked, would have committed more of the same acts.

To obtain protection as confidential business information and/or as a trade secret, the information "must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged." Trial Court Opinion ("T.C.O."), 5/9/17, at 7. Trade secrets consist of "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* (citing *Rohm and Haas Co. v. Lin*, 992 A.2d 132, 154 n.4 (Pa. Super. 2010)). Trade secrets need not be technical in nature. *Air Products and Chemicals, Inc. v. Johnson*, 442 A.2d 1114, 1124 (Pa. Super. 1982). Although items like customer lists do not automatically constitute confidential information, they do constitute trade secrets where the compilation of that information represents a "material investment of [the] employer's time and money." *Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469, 473 (Pa. 1964). Even when the employee has not entered a noncompetition agreement, the court may enjoin him from

accepting employment with a competitor when new employment would likely result in the disclosure of trade secrets. **Air Products**, 442 A.2d at 1120.

AmQuip generated its pricing formulas by combining confidential business information—including crane utilization schedules, market conditions and operation costs that were unique to AmQuip's Atlanta location—into what it called the "AmQuip Bible" of pricing and customer information. N.T., 1/26/17, at 93-94. AmQuip provided its salesmen with "extensive financial, technical, and material support in order to develop customer relationships on behalf of AmQuip." T.C.O., 5/9/17, at 8; N.T., 1/26/17, at 89-90. AmQuip also made significant investments in its salesmen to grow and retain important customer relationships. T.C.O., 5/9/17, at 8. AmQuip provided Appellants access to AmQuip's "customer lists, utilization schedules, rental contracts, equipment acquisition costs, vendor lists, and pricing models," all of which were confidential business information of AmQuip. **Id.** at 9; N.T., 1/25/17, at 45-46. In particular, the trial court credited testimony that Newell and the other Individuals had access to AmQuip's pricing formulas, which were generated using sensitive information regarding crane utilization schedules, market conditions, and operation costs that were unique to AmQuip branch locations. T.C.O., 5/9/17, at 7-8; N.T., 1/26/17, at 94-96. The trial court found it important that AmQuip salesmen "relied on AmQuip's confidential information to provide service to existing customers and acquire new business." T.C.O., 5/9/17, at 8. The court also found persuasive the fact that

AmQuip protected its confidential information by requiring employees to sign non-competition agreements and/or confidentiality policies. *Id.* While Newell did not sign a noncompetition agreement, he did sign AmQuip's confidentiality policy. The court held that, under the circumstances presented by AmQuip, "Amquip customer lists, customer rental/usage histories, rental contracts, pricing formulas, equipment costs, branch financial information, and other related information is entitled to protection as a trade secret." *Id.* at 9.

AmQuip demonstrated that Newell had access to AmQuip's trade secrets, such as names and contact information of customers from billing records, rental history, and pricing history, AmQuip's pricing information and bids, and information regarding prospective crane rental needs of particular customers. While still working at AmQuip, Newell appropriated AmQuip's quote template by e-mailing it to a private account and ACrane merely put its letterhead on top of that AmQuip document. This evidence, along with Newell's diversion of customers to ACrane and his assistance to the other Individuals in breaching their own noncompetition covenants, provided sufficient grounds for the trial court to enjoin Newell from making further use of AmQuip's confidential information.

## II.

The Individuals contend that the trial court made multiple errors in its factual conclusions. We disagree. First, the Individuals assert that the trial court overlooked the fact that Rainey and Bruu were intentionally misled into

believing that they were not subject to any restrictive covenant. Before Rainey and Bruu left AmQuip, the Individuals claim, they asked Human Resources whether there were any noncompetition agreements that applied to them, and Human Resources responded by sending them unsigned noncompetition forms. The evidence shows, however, that Bruu admitted signing a noncompetition agreement when AmQuip hired him, which agreement was attached to AmQuip's complaint. N.T., 1/25/17, at 146-49. The evidence also shows that Rainey signed a noncompetition agreement when he joined AmQuip. *Id.* at 228-30.

The Individuals contend that they had the right to leave AmQuip for a competitor because AmQuip's merger with Maxim in 2016 impaired the quality of service to AmQuip's customers. We know of no caselaw, nor do the Individuals cite any, that unhappiness with an employer's merger decisions or its alleged quality of customer service entitles employees to breach their noncompetition covenants or (in Newell's case) their common law duty of loyalty.

The Individuals also argue that AmQuip failed to demonstrate irreparable harm to its business. This argument lacks merit. AmQuip demonstrated that the group of skilled, seasoned Individuals left AmQuip to join a competitor, ACrane, and diverted some of AmQuip's largest customers to ACrane, including its largest customer, Ansco. As a result, in just three months of operation, ACrane generated over $2,000,000 in sales in Atlanta

and was projected to generate $10,000,000 in sales in its first year of operation. ACrane clearly caused substantial damage to AmQuip's Atlanta business and would have caused even more damage absent the trial court's intervention.

The Individuals claim that the trial court erred in determining that Graham voluntarily resigned from AmQuip, pointing to statements on Human Resource documents that he was involuntarily terminated. The trial court explained on pages 13-15 of its May 9, 2017 opinion that notwithstanding the Human Resource documents, credible testimony during the preliminary injunction hearing demonstrated that Graham voluntarily resigned in August 2016 due to his plan to leave AmQuip and join ACrane. Having reviewed the evidence cited in the trial court's opinion, we see no reason to disturb this factual finding.

### III-IV.

In their third and fourth arguments, which we review together, the Individuals complain at length that the trial court failed to apply the balancing test articulated by our Supreme Court in *Hess v. Gebhard & Co., Inc.*, 808 A.2d 912 (Pa. 1988), for determining whether to enforce Rainey's, Bruu's and Graham's noncompetition covenants. This test requires the court to balance the employer's protectible interests against the employee's interests in earning a living in his chosen occupation and the public interest. *Id.* at 920-21. Not only must the employer prevail under this balancing test, but also the

employer must furnish proof that the noncompetition covenant is supported by adequate consideration and is reasonably limited in duration and geographic scope. **WMI Group, Inc. v. Fox**, 109 A.3d 740, 748 (Pa. Super. 2015).

The trial court determined, and we agree, that AmQuip met all of these requisites. T.C.O., 2/10/17, at 7. Rainey, Bruu and Graham entered the noncompetition covenants as a condition of employment at AmQuip. The law is clear that the taking of employment is sufficient consideration for a noncompetition covenant. **Records Ctr. v. Comprehensive Management, Inc.**, 525 A.2d 433, 435 (Pa. 1987). Appellants do not contest the reasonableness of the duration or geographic scope of the noncompetition covenants. In addition, as discussed above, the evidence demonstrated that the Individuals had access to AmQuip's confidential business information, the value of which was shown by ACrane's exponential growth after the Individuals joined this fledgling company. Enforcement of the noncompetition covenants was necessary to prevent additional misuse of this information.

The Individuals insist that any difficulties incurred by AmQuip are miniscule compared to the difficulty that the Individuals will face in finding new employment after working in the crane industry for decades. Nevertheless, Rainey, Bruu and Graham brought this problem on themselves by breaching their noncompetition covenants. **See Quaker Chemical Corp. v. Varga**, 509 F. Supp. 2d 469, 480 (E.D.Pa. 2007) (applying Pennsylvania

law) (collecting cases) ("the fact that Varga, by resigning from Quaker and joining Stuart in spite of knowing about the non-compete covenant, brought this dispute on himself weighs against him here").[4] To accept the Individuals' argument would be to frustrate large employers who have substantial interests in safeguarding against employees who would otherwise betray them. As the court in **Varga** reasoned:

> [I]n a case such as this, the harm to the employee almost always seems greater than the harm to the company. The employer, as a company—in this case, a very successful company, it appears— will be able to financially survive an employee's leaving for a competitor. And the employee, as an individual, apparently will have a hard time financially surviving if he is out of work. By this superficial calculus, the harm to the employee is always greater . . . If this were the rule, no restrictive covenant would be enforced against a large and successful company.
>
> But the numerous courts that have specifically enforced non-compete covenants against the employee have concluded that, regardless of the relative wealth of the employer and employee, the harm to the employer trumps the harm to the employee.

**Id.** The public also has a substantial interest in the enforcement of noncompetition covenants, for this practice "will discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets, and the disavowal of freely contracted obligations." **Id.** at 481 (citing **Graphic Mgmt. Assocs. v. Hatt**, 1998 WL 159035, at *19 (E.D.Pa. Mar.18, 1998)).

---

[4] While decisions from federal district courts are not binding on this Court, we may rely on them for persuasive authority. **EMC Mortgage, LLC v. Biddle**, 114 A.3d 1057, 1064 n.6 (Pa. Super. 2015).

For these reasons, we conclude that the trial court acted within its discretion by entering the preliminary injunction against the Individuals. We direct that copies of the trial court's February 10, 2017 and May 9, 2017 opinions be attached to any future filings in this case.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/27/18