J-A19042-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MJ TEST PREP, LLC AND MATTHEW W. JOSEPH, PH.D., | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DAVID LYNCH AND VELTIO, LLC | : | |
| | : | No. 3531 EDA 2019 |
| Appellants | : | |

Appeal from the Order Entered November 27, 2019
In the Court of Common Pleas of Delaware County Civil Division at
No(s):  No. CV-2019-004426

BEFORE:  PANELLA, P.J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    Filed: January 21, 2021

David Lynch and Veltio, LLC (collectively, Appellants) appeal from the order entered in the Delaware County Court of Common Pleas, granting a preliminary injunction in favor of MJ Test Prep, LLC and Matthew W. Joseph, Ph.D. (collectively, Appellees), based upon a non-compete agreement.  On appeal, Appellants contend the trial court erred or abused its discretion in: (1) enforcing the non-compete agreement where only Joseph and Lynch individually were signatories; (2) ignoring evidence that the test prep materials created by Lynch were not subject to the Copyright Act; (3) concluding that Appellees established their worksheets and materials constituted trade secrets;  (4) concluding Appellees established the prerequisites for a preliminary injunction; and (5) determining that a three-year temporal restriction was reasonable.  Based on the following, we affirm.

The facts underlying this appeal are detailed in the trial court's opinion as follows:

**FACTUAL FINDINGS:**

1. [Appellee] Joseph is a founder and principal of [Appellee] MJ Test Prep. MJ Test Prep was formed on May 11, 2006. It is a Pennsylvania limited liability company with a place of business at 756 [E]ast Haverford Road, Bryn Mawr, PA, 19010. MJ Test, Prep, provides college admissions and professional tutoring services in the Philadelphia metropolitan area. [ ] Joseph is a fifty (50%) percent owner of MJ Test Prep along with his wife Renata Joseph ("Renata"), who owns the remainder of MJ Test Prep.

2. [Appellant] David Lynch is an individual with a residence [in] Wynnewood, PA . . . . [Appellant] Veltio, LLC is a Pennsylvania limited liability company with [the same] address . . . . Lynch is the sole owning [m]ember of Veltio. Veltio owns and operates StudyLark Test Prep ("StudyLark"), through which Lynch provides college admissions and professional tutoring services in the Philadelphia metropolitan area including an office located at 230 Sugartown Road, Wayne PA, 19087. Lynch formed Veltio on April 27, 2018. The Parties have stipulated to the fact that Lynch is the 100% owner of Veltio.

3. After becoming aware of a test prep company, MJ Test Prep, operating near his residence, Lynch reached out to inquire about potential employment opportunities. Joseph responded and set up a meeting with Lynch, in which they talked about Lynch doing a few small projects with Joseph.

4. [ ] Lynch started to work for MJ Test Prep as an independent contractor around September 2009.

5. On August 31, 2009, Joseph and Lynch entered into a Non-Compete Agreement. [ ] MJ Test Prep and [ ] Veltio LLC are not parties to the purported Non–Compete Agreement ("Agreement"). The Parties to this Agreement are Matthew Joseph Ph.D. and David Lynch[, in their individual capacities].

6. The terms of the Agreement state that Lynch would not disclose confidential information or proprietary information, compete with Joseph, and solicit clients of Joseph for a period of three (3) years after the Agreement ends for any reason, and

- 2 -

within a fifty (50) mile geographic radius from Joseph's place of business.

7. Joseph testified the Agreement was given to Lynch by Joseph. In the Agreement, Lynch is considered an independent contractor. Lynch testified [t]he Agreement acknowledged that Lynch had an existing employment relationship with Examkrackers Inc., [which] provides admissions and professional tutoring services to prepare clients for graduate school entrance tests. The Agreement states that Lynch may continue and carry on an ongoing employment relationship with Examkrackers Inc., whether on a contract, salaried, or unpaid basis. Lynch testified that [h]e wrote the portion of the agreement regarding his ability to work for Examkrackers Inc.

8. Joseph has operated his test prep business with teaching techniques he developed during his Ph.D. work and has enhanced in the years since earning his Ph.D. The core to his technique is the worksheets he has developed and revises continuously. The worksheets rely on a particular sequence of practice questions taken from tests provided by the entrance exam taking companies. Joseph does not create the questions. His teaching method is a combination of the sequence of the questions and the method of solving the questions, which involves techniques other than teaching mathematics or grammar.

9. The Parties stipulated that all of the questions that are in the worksheets used by MJ Test prep came from standardized tests authored by others.

10. In addition to tutoring students for the LSAT, GMAT, GRE, subject tests, SAT and the ACT, Lynch performed administrative work for MJ Test Prep, including developing and formatting the worksheets and the binders used by MJ Test Prep. Lynch put test problems in the sequence that Joseph instructed. The worksheets and binders contain problem-solving instructions. In some instances, the problem-solving instructions were conceived of and inserted into the worksheets by Lynch without the direction from Joseph. In other instances, the problem-solving instructions were conceived of by Joseph and inserted into the worksheets by Lynch per instructions from Joseph.

11. The worksheets and binders developed by Lynch contain the copyright insignia identifying MJ Test Prep as the copyright holder. Versions of worksheets and binders from before Lynch started with MJ Test Prep also contained the MJ Test Prep copyright

insignia. As part of Lynch's work in developing and formatting worksheets, Lynch physically put a copyright insignia on documents and never requested that it have a Lynch copyright insignia alone or jointly with MJ Test Prep.

12. Lynch was paid by MJ Test Prep for his independent contractor services throughout the course of his relationship with Joseph and MJ Test Prep. The Parties stipulated that all payments made to Lynch and Veltio were made by MJ Test Prep.

13. After an IRS audit in 2013, Renata gave Lynch a non-compete agreement between Lynch and MJ Test Prep. Lynch declined to sign this non-compete agreement. Despite being presented with and declining to sign a new non-compete agreement, Lynch continued to provide independent contractor services to MJ Test Prep at its Bryn Mawr office.

14. MJ Test Prep opened a second location in Chestnut Hill in 2014, located at 14 W[.] Evergreen Ave, Philadelphia, PA 19118. Lynch never worked in the Chestnut Hill location of MJ Test Prep.

15. The Bryn Mawr and Chestnut Hill offices of MJ Test Prep are approximately twelve (12) miles apart.

16. Lynch's wife Sophia started to work for MJ Test Prep around April 2018 as a receptionist.

17. Originally, MJ Test Prep paid Lynch for his independent contractor services directly to his person. Around April or May 2018, Lynch and Sophia asked MJ Test Prep to pay the two of them by writing checks to Veltio, and MJ Test Prep complied with that request. No written Agreement was made between Veltio and MJ Test Prep.

18. Around September 2018, Lynch and Sophia proposed a business endeavor to the Josephs in which Lynch and Sophia would operate a test prep business through Veltio and MJ Test Prep would license its test prep materials to Veltio . . . in exchange for a revenue sharing arrangement for a rate to be determined. The Josephs declined to license MJ Test Prep's materials to Veltio, Lynch, and Sophia.

19. In October 2018, Renata asked Sophia to sign a non-compete agreement even though she had stopped working for MJ Test Prep and again Lynch was asked to sign a non-compete agreement to

ratify his promise not to compete with MJ Test Prep. Both Lynch and Sophia declined to sign such agreement.

20. In late 2018/early 2019, MJ Test Prep stopped requesting service of any kind from Lynch[.] Lynch resigned from his work at MJ Test Prep in mid-March 2019.

21. In March 2019, Lynch first started providing tutoring services through Veltio/Studylark, after his final tutoring session at MJ Test Prep.

22. Around April 30, 2019, MJ Test Prep learned Lynch was and had been operating a competing business, Studylark and offering services in Wayne and Media[,] Pennsylvania. Lynch publishes study guides and provides test prep services under the trade name Studylark Test Prep through Veltio.

23. In May 2019, Lynch signed a lease on behalf of Studylark for an office located at 230 Sugartown Road, Wayne PA, 19087. Veltio also has an office at 24 Veterans Square, Media, Pennsylvania.

24. By letter dated May 13, 2019, Lynch was advised he was in violation of the Non–Compete Agreement dated August 31, 2009, by, establishing a competing business, StudyLark, in the same market as MJ Test Prep within the 50-mile geographical restriction established by the Agreement. Lynch was also advised that MJ Test Prep believed Lynch violated the Agreement by disclosing or appropriating confidential, business and proprietary information by soliciting clients of MJ Test Prep. The letter further instructed Lynch to cease these activities.

Trial Ct. Op., 2/4/20, at 3-8 (footnote omitted).

When Lynch refused to cease all operations of Studylark, Appellees initiated this action by writ of summons on May 21, 2019. Thereafter, on June 21st, Appellees filed a complaint raising claims of breach of contract, a violation of Pennsylvania's Uniform Trade Secrets Act,[1] and misappropriation

---

[1] 12 Pa.C.S. §§ 5301-5308.

of confidential information. **See** Appellee's Complaint, 6/21/19, at 11-15. In addition, the complaint sought injunctive relief and an accounting. **Id.** at 15-17. Appellants filed preliminary objections, which were still pending when, on August 19, 2019, Appellees filed a motion for a preliminary injunction. The hearing on the preliminary injunction spanned three days — September 18, 19, and 24, 2019 — at which time, the court took the matter under advisement. On November 27, 2019, the trial court entered the underlying order granting Appellees' motion for a preliminary injunction, enjoining Appellants, and "anyone acting on their behalf or with them, . . . from . . . operating StudyLark Test Prep or engaging in any business that provides college admission or graduate school admissions tutoring services" within a 10 mile radius of MJ Test Prep's Bryn Mawr office, for a period of three years, or from using StudyLark's Wayne and Media locations for tutoring, teaching, marketing, or soliciting of clients for a three year period. Order, 11/27/19, at 12. The order also prohibited Appellants from (1) "disclosing or using MJ Test Prep's business information, including the materials and all worksheets . . . having . . . a copyright stamp[,]" and (2) "soliciting MJ Test [P]rep's current or former clients for a period of three (3) years[.]" **Id.** Lastly, the court directed Appellants to "return all of MJ Test Prep's business information . . . within ten (10) days[.]" **Id.** This timely appeal follows.[2]

---

[2] An order granting an injunction is an interlocutory order appealable as of right pursuant to Pa.R.A.P. 311(a)(4). We will discuss Appellants' compliance with Pennsylvania Rule of Appellate Procedure 1925 **infra**.

Appellants raise five issues for our review:

1.   Whether the trial court erred and abused its discretion in entering a preliminary injunction based on its finding that the agreement dated August 31, 2009 between [ ] Joseph and [ ] Lynch, for which there was no consideration, and which was not assigned or transferred to MJ Test Prep LLC, is enforceable by MJ Test Prep LLC against [ ] Lynch and Veltio LLC?

2.   Whether the trial court erred and abused its discretion by initially ignoring the requirements of the Copyright Act, 17 U.S.C. § 101(2) in entering the preliminary injunction, and subsequently ignoring the undisputed evidence that [ ] Lynch was an independent contractor without any written agreement when he provided services to MJ Test Prep LLC to support the relief granted?

3.   Whether the trial court erred and abused its discretion in enjoining [ ] Lynch and Veltio LLC from disclosing or using MJ Test Prep LLC's confidential or proprietary business information, when [Appellees] failed to establish that MJ Test Prep LLC has confidential or proprietary information or trade secret information as defined by the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. [§] 5301, *et seq.*?

4.   Whether the trial court erred and abused its discretion in entering a preliminary injunction when the evidence presented at the injunction hearing established that [ ] Joseph and MJ Test Prep, LLC, who had the burden of proof, failed to establish each of the essential prerequisites to preliminary injunctive relief?

5.   Whether the trial court erred and abused its discretion in finding the 3-year temporal restriction in the (unenforceable) August 31, 2009 agreement to be reasonable?

Appellants' Brief at 4-5.

Before we address the substantive claims raised on appeal, we must first consider the trial court's determination that Appellants failed to comply with Pennsylvania Rule of Appellate Procedure 1925(b). **See** Trial Ct. Op. at 12.  Although Appellants filed a timely statement of errors complained of on

- 7 -

appeal pursuant to the court's directive, the "concise statement" was 12 pages in length, and raised 27 separate claims. *See* Appellee's Statement of Matter Complained of on Appeal, 12/30/19. Thus, the trial court found that "the voluminous number of issues identified by Appellant[s] . . . impede[d] the ability of [the court] to undertake a meaningful review of the issues raised on appeal." Trial Ct. Op. at 12. Accordingly, the court suggests Appellants have waived all claims on appeal. *See id.* at 9-12. Nevertheless, the court proceeded to address the issues that it was able to "glean[ ] from Appellants' [1925(b)] Statement." *Id.* at 13.

Pennsylvania Rule of Appellate Procedure 1925 requires an appellant to file a statement of errors complained of on appeal when ordered to do so by the trial court. Pa.R.A.P. 1925(b). The Rule further provides that the Statement "shall **concisely** identify each error that the appellant intends to assert" on appeal, and "should not be redundant or provide lengthy explanations as to any error." Pa.R.A.P. 1925(b)(4)(ii), (iv) (emphasis added). Moreover, the Rule explicitly states: "Issues not included in the Statement and/or **not raised in accordance with the provisions of this paragraph** (b)(4) are waived." Pa.R.A.P. 1925(b)(4)(vii) (emphasis added).

This Court has held that when an appellant fails to set forth its appellate issues "in a concise manner," it may impede the trial court's ability to prepare an opinion, and thereby frustrate this court's "ability to engage in a meaningful and effective appellate review process." *Kantor v. Epstein*, 866 A.2d 394, 401 (Pa. Super. 2004) (concluding that the appellants "effectively precluded

appellate review" when they, collectively, raised 104 issues, with multiple sub-issues, and "deliberately circumvented the meaning and purpose of Rule 1925(b)").[3]   Nevertheless, we have also declined to find waiver when a "voluminous 1925(b) statement was not the result of bad faith or an attempt to impede the appellate process." **Boehm v. Riversource Life Ins. Co.**, 117 A.3d 308, 319 n.3. (Pa. Super. 2015) (1925(b) statement raised 36 claims of error).

While the Rule 1925(b) statement filed by Appellants in the present case included numerous repetitive claims, we decline to find waiver here absent any allegation of bad faith.[4]   Moreover, the trial court was able to address in its opinion the issues Appellants raise on appeal.  Thus, we proceed to a review of Appellants' substantive claims.

In their first issue, Appellants challenge the enforceability of the non-compete agreement.  Appellants' Brief at 24.  Specifically, they assert that the agreement, entered into only by Joseph and Lynch individually, is not enforceable by MJ Test Prep nor against Veltio.  **Id.**  Appellants maintain that Joseph and Renata's conduct — requesting Lynch sign a new non-compete agreement years later — "illustrates their awareness that . . . MJ Test Prep could not enforce any restrictive covenants because it had no agreement with

---

[3] We note Rule 1925 has been amended several times since the **Kantor** decision in 2004.  **See** Pa.R.A.P. 1925, *Credits*.

[4] We caution Appellants' counsel, however, that this Court will view repeated violations of Rule 1925(b) as evidence of bad faith.

Lynch." *Id.* at 37.  Appellants insist that, "without an assignment, a restrictive covenant can be enforced only by a party to the covenant against a party to the covenant." *Id.* at 24.  Furthermore, by permitting MJ Test Prep to enforce the agreement, they contend the trial court "disregarded the corporate entities and treated them as if they were the same as the individual parties." *Id.* at 31.  Lastly, Appellants assert there was no consideration for the non-compete agreement since Lynch never performed work for Joseph, and, therefore, the agreement never went into effect.  *Id.* at. 35.  We will address these claims *seriatim*.

> Our review of an order granting a preliminary injunction is well-settled:
>
> [T]his Court must "conduct a searching inquiry of the record. Accordingly, . . . the scope of review in preliminary injunction matters is plenary."  Our standard of review is "highly deferential." Under this standard, "[we do] not inquire into the merits of the controversy, but rather examine[ ] only the record to ascertain **whether any apparently reasonable grounds existed for the action of the court below.**  We may reverse if the trial court's ruling amounted to an abuse of discretion or a misapplication of law."

*AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 199 A.3d 904, 913 (Pa. Super. 2018) (citations omitted and emphasis added).

In the present case, Appellees' request for relief was based upon a restrictive covenant, specifically a non-compete agreement.

> To establish a clear right to relief on a claim for breach of restrictive covenants of an employment contract, a party must, *inter alia*, demonstrate the following:
>
>> In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are

reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent. Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer. However, restrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.

Pennsylvania cases have recognized that trade secrets of an employer, customer goodwill and specialized training and skills acquired from the employer are all legitimate interests protectable through a general restrictive covenant. In essence, the court must examine and balance the employer's legitimate business interest, the individual's right to work, the public's right to unrestrained competition, and the right to contract in determining whether to enforce a restrictive covenant.

In construing a restrictive covenant, courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. It is not the function of this Court to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used.

*WMI Grp., Inc. v. Fox*, 109 A.3d 740, 748–49 (Pa. Super. 2015) (citation omitted).

Appellants' primary argument is that "the trial court enforced a non-existent agreement," because the only signatories to the agreement were Joseph, as an individual (identified as the employer), and Lynch, as an individual (identified as the independent contractor). Appellants' Brief at 24. Appellants emphasize that Joseph drafted the agreement, and chose not to name his company, MJ Test Prep, as the employer. *Id.* at 24-25. Because "Joseph ultimately chose not to employ Lynch in his personal capacity and

requested no work from Lynch," Appellants insist the non-compete agreement was rendered a "nullity." *Id.* at 25. Moreover, Appellants emphasize that non-compete agreements "are personal and not assignable without the express consent of the employee." Appellant's Brief at 26, *quoting **All-Pak, Inc. v. Johnston***, 694 A.2d 347, 351 (Pa. Super. 1997). Similarly, Appellants maintain there was no consideration for the agreement because "no work was ever performed under the agreement" by Lynch for Joseph, in his individual capacity. *Id.* at 36.

The trial court, however, found the agreement "was intended to apply between them and the companies through which they work, pay and are paid, which from the beginning was MJ Test Prep and Lynch, and since March 2018 included Lynch's company Veltio, LLC." Trial Ct. Op. at 15. The court emphasized the following facts:

> [ ] Lynch sough employment from MJ Test Prep LLC after noticing its business front located at 756 East Haverford Road, Bryn Mawr, Pennsylvania[.] Lynch met with [ ] Joseph, principal and owner of MJ Test Prep, LLC, at [the] Bryn Mawr location to enter into the non-compete agreement at the center of this case. The non-compete agreement entered into by Joseph and Lynch states Joseph's address as 756 East Haverford Road, Bryn Mawr, Pennsylvania[ —] the same address as the MJ Test Prep location that [ ] Lynch first noticed and the location which he was physically present when he entered into the agreement. . . . MJ Test Prep was not a stranger to this deal. MJ Test Prep's Bryn Mawr location was initially what caught Lynch's attention and inspired him to reach out to the business' principal, [ ] Joseph. From the genesis of the relationship, Lynch dealt with Joseph in his capacity as principal of MJ Test Prep. Lynch even accepted all payment for his employment efforts by MJ Test Prep over the near decade long employment relationship. This Court is not persuaded by the notion that MJ Test Prep LLC is a stranger, or unknown entity, to

[ ] Lynch simply because [ ] Joseph was the signatory to the non-compete agreement between the parties. At the time of signing, [ ] Lynch clearly knew of MJ Test Prep. He knew [ ] Joseph was the principal and owner of MJ Test Prep. [ ] Lynch even signed the Agreement at MJ Test Prep's actual place of business.

*Id.* at 14-15.

We agree. At the time the parties signed the non-compete agreement, Lynch was well aware Joseph was hiring him to work for **MJ Test Prep**. Indeed, the agreement stated, in pertinent part:

Independent Contractor [Lynch] is being hired to teach and tutor individuals in preparation of standardized testing, including but not limited to SATs, SSATs, GREs, Gmats, LSATs; and is willing to provide services as a tutor/instructor for Employer.

Appellees' Complaint, 6/21/19, Exhibit 1, Non-Compete Agreement, 8/31/09, at 1 (unpaginated). There was no evidence or testimony presented that, after the creation of his company in 2006, Joseph, individually, provided tutoring services outside of MJ Test Prep.

We recognize that Lynch testified he was hired to "do some special projects for" Joseph, and that he insisted on including the addendum acknowledging his continued employment with Examkrackers "because [he] wasn't sure if these small projects with Mr. Joseph would actually lead anywhere." N.T., 9/24/19, at 33. Lynch further testified he "believed [he] was going to be working for Mr. Joseph" because Joseph's name was on the non-compete agreement, and the first time he realized he would be working for MJ Test Prep was when he received his first paycheck. *Id.* at 34.

Conversely, Joseph testified that the agreement was in his name because "that's who we are" and that he did not recognize any difference

between "Matt Joseph and MJ Test Prep." N.T., 9/18/19, at 135-36. Indeed, from the inception of his employment, Lynch worked out of MJ Test Prep's office, used "documents that were copyrighted by MJ Test Prep," and was paid with checks written by MJ Test Prep; further, all his clients wrote a check for his services payable to MJ Test Prep. *Id.* at 136-37. Therefore, the trial court, as fact finder, was free to resolve this conflict in favor of Joseph. *See Turner Const. v. Plumbers Local 690*, 130 A.3d 47, 62 (Pa. Super. 2015) ("It is beyond peradventure that the trial court is empowered to weigh the evidence and to resolve matters of credibility.").

Moreover, the cases upon which Appellants rely are distinguishable. Both *Hess v. Gebhard & Co.*, 808 A.2d 912 (Pa. 2002), and *All-Pak, Inc.*, concern the assignability of an employee's non-compete agreement when a business is later **sold to a third party**. *See Hess*, 808 A.2d at 922 (holding "a restrictive covenant not to compete, contained in an employment agreement, is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in a sale of assets"); *All-Pak, Inc.*, 694 A.2d 351 (holding non-compete covenants "should be construed narrowly[ ] and, absent an explicit assignability provision, courts should be hesitant to read one into the contract[;] a successor employer is free to negotiate new employment contracts with the employees"). Further, in *Hess*, the Pennsylvania Supreme Court rejected the argument that the original employer could still enforce the agreement since it had "retain[ed] a financial interest" in the business for several years after the

- 14 -

sale to the third party. **Hess**, 808 A.2d at 923. The Court explained that "pure financial gain at the expense of restricted competition is insufficient to constitute a protectable business interest." **Id.**

Here, however, there was no sale of the business to a third party, or assignment of the non-compete clause. Joseph was co-owner of MJ Test Prep with his wife, Renata. Unlike in **Hess** and **All-Pak**, Joseph **was** the business. Upon our review, we conclude the record contains reasonable grounds for the trial court's determination that that Lynch agreed to work for, and not compete with, MJ Test Prep.[5] **See AmQuip Crane Rental, LLC**, 199 A.3d at 913. **See also Daniel Adams Associates, Inc. v. Rimbach Pub., Inc.**, 519 A.2d 997, 1000-01 (Pa. Super. 1987) ("A corporation is a creature of legal fiction which can 'act' only through its . . . agents[, and w]here a party contracts with a corporation through a corporate agent who acts within the scope of his

_____

[5] We note Appellants state in their brief — absent a citation to the record — that "Lynch and Joseph both testified that the agreement was to reflect their **personal** relationship" and that Joseph's testimony "established Joseph wanted to be Lynch's employer," which is why the agreement is signed by him individually. Appellants' Brief at 30 & n.17 (emphasis added). However, our review of the record reveals no support for this assertion. Rather, as noted above, Joseph testified he did not see a distinction between himself and MJ Test Prep, and at all times, Lynch was paid with a business check, the sign on the door of his office stated "MJ Test Prep," and his clients paid for services to "MJ Test Prep." **Id.** at 136-37. Thus, we conclude Joseph's testimony established just the opposite — that is, he intended to hire Lynch as an independent contractor for MJ Test Prep.

authority and reveals his principal, the corporate principal alone is liable for breach of the contract.") (citations omitted).[6]

Appellants also rely on **WMI Group, Inc.**, for the proposition that a trial court may not disregard the plain language of an employment agreement to consider the parties' intent. **See** Appellants' Brief at 25-26 n.12. Again, the facts in **WMI** are distinguishable from those presented herein. In that case, the employee signed an employment agreement and non-compete clause with WMI in 2004. **WMI Group**, 109 A.3d at 743. The agreement also contained a clause that stated it would "automatically terminate if and when [the e]mployee assumes a different position in the Company and signs a new Agreement, or upon termination of employment." **Id.** (citation omitted). Several years later, the employee was promoted to a new position in a separate, but related, business entity — WM Robots, LLC — owned by the same individuals. **Id.** at 744 (citation omitted). The employee's promotion agreement did not contain a non-compete clause. **Id.** (citation omitted). The employee was promoted again several years later before later resigning, and opening his own competing business. **Id.** at 745-46.

The second employer — WM Robots, LLC — filed a complaint against the employee and his new company alleging, *inter alia*, breach of contract, and

_____

[6] For the same reasons, the record supports the trial court's finding that Lynch's non-compete agreement bars **Veltio** from operating StudyLark. Lynch is the sole owner of Veltio, an LLC he formed "on the advice of an accountant" to "mitigate" some of his tax liability as an independent contractor. N.T., 9/19/19, at 135; N.T., 9/24/19, at 66-67.

seeking a preliminary injunction. **WMI Group**, 109 A.3d at 746 (citation omitted). Following a hearing, the trial court denied the petition for preliminary injunction and the employer appealed to this Court. **Id.** The employer argued that the employee's promotion agreements did not void his original non-compete clause, and the parties' "unstated intent" was "to incorporate the original [ ] agreement . . . by implicit reference." **Id.** at 747. A panel of this Court rejected the employer's claim, concluding the one year non-compete clause became effective when the employee "terminated employment with WMI and joined WM Robots, LLC[; the employee] **did not** assume a different position within WMI." **Id.** at 750 (emphasis added). We also rejected the employers' attempt to rely on parol evidence to "establish the parties' intent to incorporate by reference the 2004 agreement's non-compete clause." **Id.** This Court stated: "[The employers] have not referred this Court to any ambiguous language such that we may resort to extrinsic and parol evidence." **Id.**

Here, however, Appellees did not attempt to enforce a non-compete agreement entered into by **another party**. Unlike in **WMI**, Joseph was not a principal of two separate corporate entities. Rather, it was clear to both parties that Joseph signed the non-compete agreement as principal of MJ Test Prep, and Lynch signed the agreement intending to provide tutoring services for MJ Test Prep. Therefore, the consideration for the agreement was Appellants' employment of Lynch. **See Pulse Techs., Inc. v. Notaro**, 67 A.3d 778, 781 (Pa. 2013) ("As long as the restrictive covenants are an

auxiliary part of the taking of regular employment, and not an after-thought to impose additional restrictions on the unsuspecting employee, a contract of employment containing such covenants is supported by valid consideration, and is therefore enforceable.") (citation omitted).

We also reject Appellants' assertion that "the conduct of Joseph and MJ Test Prep established their awareness that they had no enforceable [non-compete] agreement with Lynch." *See* Appellants' Brief at 37. Indeed, Appellants emphasize that after an IRS audit in 2013 and again several years later, Appellees asked Lynch to sign a new non-compete agreement with MJ Test Prep, but he refused. *Id.* However, Renata testified that the later non-compete agreements presented to Lynch were revised by "lawyers working in our office as tutors," and although the subsequent agreements listed MJ Test Prep as the employer, she and Matthew Joseph were "not worried" because Lynch had "signed an agreement with us." N.T., 9/24/19, at 16, 18. Accordingly, Renata's testimony disputes Appellees' contention that MJ Test Prep asked Lynch to sign a second non-compete agreement because it **knew** the original agreement was unenforceable. Accordingly, Appellants' argument fails.

Next, Appellants contend the trial court erred when it enjoined them from keeping and using the worksheets and materials Lynch created when he was employed by MJ Test Prep. Appellants' Brief at 38. They argue that,

- 18 -

pursuant to the Copyright Act,[7] "a signed 'Work for Hire' agreement is required for an employer to attain ownership and copyright privilege to any work created by an independent contractor." *Id.* Because there is no "work for hire" agreement between the parties, Appellants insist that "Lynch, not MJ Test Prep, owns the materials [Lynch] created while providing independent contractor services for MJ Test Prep." *Id.* at 41.

Section 201 of the Federal Copyright Act provides that the "[c]opyright in a work protected under [the Act] vests initially in the author or authors of the work." 17 U.S.C. § 201(a). However, subsection (b) provides that, when a work is "made for hire, the **employer** or other person for whom the work was prepared is considered the author for purposes of this title[.]" 17 U.S.C. § 201(b) (emphasis added). Section 101 defines a "work made for hire" as follows:

> (1) a work **prepared by an employee within the scope of his or her employment**; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, . . . as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties **expressly agree in a written instrument signed by them** that the work shall be considered a work made for hire. . . .

17 U.S.C. § 101(1)-(2) (emphases supplied).

Appellants argue that "Lynch, not MJ Test Prep, owns the material he created while providing independent contractor services for MJ Test Prep."

---

[7] 17 U.S.C. §§ 101-1401.

Appellants' Brief at 41. Relying on the United States Supreme Court's decision in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), Appellants maintain a "work for hire" can be attained by "'two mutually exclusive means' . . . the first for employees, and the second for independent contractors." Appellant's Brief at 40, *citing* *Community for Creative Non-Violence*, 490 U.S. at 742-43. Because "it is undisputed that Lynch was an independent contractor for MJ Test Prep," Appellants contend the materials Lynch created were not "a work prepared by an **employee** within the scope of his or her employment" under Section 101 of the Copyright Act. **See** Appellants' Brief at 41; 17 U.S.C. § 101(1) (emphasis added). Moreover, because Lynch did not sign a "work for hire" agreement with either MJ Test Prep or Joseph,[8] Appellants assert the materials Lynch created did not become "a work made for hire" under the Act. **See** Appellant's Brief at 41.

The trial court, however, found the flaw in Appellants' argument was that they "made the assumption that [ ] Lynch is considered an independent contractor and not an employee for the purposes of applying" Section 101(2). Trial Ct. Op. at 18. Rather, the trial court analyzed whether Lynch would be considered an employee under the "common law agency doctrine," as set forth by the Supreme Court in *Community for Creative Non-Violence*:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry

---

[8] **See** N.T., 9/24/19, at 35-36.

are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative.

*See Community for Creative Non-Violence*, 490 U.S. at 751-52 (footnotes and citations omitted). *See also* Trial Ct. Op. at 19-20.

In its opinion, the trial court detailed the testimony presented during the preliminary injunction hearing, which it found supported its determination that Lynch was working as an "employee" of MJ Test Prep for purposes of the Copyright Act. *See* Trial Ct. Op. at 20-22. These facts include: (1) all the worksheets and binders Lynch created for MJ Test Prep contained the company's copyright insignia; (2) the employment relationship lasted for nearly 10 years; (3) "Lynch was not paid upon the completion of a specific job[, but rather,] was paid by the hour for his efforts like an employee;" (4) Lynch "held the title of Senior Tutor and Director of Curriculum Development;" and (5) Lynch's work "was always subject to the control and approval of Joseph and MJ Test Prep much like an employee's work." *Id.* Thus, the court found that "Lynch is considered an employee for purposes of the Copyright Act . . . [and] no Work for Hire agreement [was] necessary for MJ Test Prep to attain ownership of the work created by Lynch during the course of his

employment with Joseph and MJ Test Prep." *Id.* at 22. We agree, and adopt the trial court's analysis of this issue.

We note that Appellants do not refute the court's findings; rather, they insist there was no need for the court to undertake the analysis in the first place because "it is undisputed that Lynch was an independent contractor for MJ Test Prep." *See* Appellants' Brief at 41. Furthermore, they insist the trial court misinterpreted the Supreme Court's discussion in ***Community for Creative Non-Violence***, where, "unlike here, the parties had not already labeled the relationship." *Id.* Appellants, however, provide no authority for their assumption that the parties' "labeling" of the relationship settles the question of whether a person is an "employee" who created a work within the scope of their employment for purposes of Section 101(1) of the Copyright Act. Indeed, in ***Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.***, 871 F.Supp. 709 (S.D.N.Y. 1995), a federal district court[9] concluded that a worker was an employee for purposes of the Copyright Act despite the fact the worker received compensation from an "affiliated entity" rather than the employer itself, and the employer reported the worker as an independent contractor to "federal and state taxing authorities." *Id.* at 719. The court explained: "While [the employee] may have held the title of 'independent contractor,' . . . 'an independent contractor is an 'employee' for

---

[9] We acknowledge that "[d]ecisions of the federal district courts are not binding authority for this Court;" nevertheless, we may rely upon them for persuasive authority. ***Huber v. Etkin***, 58 A.3d 772, 780 n.7 (Pa. Super. 2012) (*en banc*).

the purposes of the Act if the contractor was not truly independent, but was controlled and supervised in the creation of the particular work by the employing party.'" ***Id.*** (citation omitted). The federal district court found that under the particular facts of that case, the worker was an employee for purposes of Section 101. ***Id.*** Accordingly, Appellants' second claim fails.

In their third claim, Appellants argue the trial court erred when it found MJ Test Prep's worksheets and materials constituted protectable trade secrets as defined by Pennsylvania's Uniform Trade Secrets Act. ***See*** Appellants' Brief at 42. Specifically, Appellants assert the information contained on the worksheets was copied "from previous standardized tests" and there was "nothing unique about the explanations provided in the worksheets." ***Id.*** at 44. Furthermore, Appellants emphasize the worksheets were stored on a "'wall of worksheets' in open, unlocked cubbies in MJ Test Prep's offices where they are easily accessible" and were routinely given to students, "who [were] not required to return them." ***Id.*** at 45-46. Thus, Appellants contend Appellees failed to establish that Lynch appropriated trade secrets.

Pennsylvania's Uniform Trade Secrets Act permits an aggrieved party to seek an injunction to prevent an "[a]ctual or threatened misappropriation" of a trade secret. 12 Pa.C.S. § 5303(a). The Act defines a trade secret as follows:

> **"Trade secret."** Information, including a formula, drawing, pattern, **compilation** including a customer list, program, device, method, technique or process that:

(1) Derives independent economic value, actual or potential, from **not being generally known to, and not being readily ascertainable by proper means** by, other persons who can obtain economic value from its disclosure or use.

(2) Is the subject of efforts that are **reasonable under the circumstances to maintain its secrecy**.

12 Pa.C.S. § 5302(1)-(2) (some emphases added).

"The question of whether information is a trade secret is determined on a case-by-case basis and can include confidential customer lists." ***Shepherd v. Pittsburgh Glass Works, LLC***, 25 A.3d 1233, 1245 (Pa. Super. 2011). This Court has compiled the following list of factors that a trial court should consider in determining whether information constitutes a trade secret:

1) the extent to which the information is known outside of [the] business; 2) the extent to which it is known by employees and others involved in [the] business; 3) the extent of measures taken by [the employer] to guard the secrecy of the information; 4) the value of the information to [the employer] and to [its] competitors; 5) the amount of effort or money expended by [the employer] in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others. "The crucial **indicia** for determining whether certain information constitutes a trade secret are 'substantial secrecy and competitive value to the owner.'"

***Crum v. Bridgestone/Firestone N. Am. Tire, LLC***, 907 A.2d 578, 585 (Pa. Super. 2006) (citations omitted). Moreover, "if a competitor could obtain the information by legitimate means, it will not be given injunctive protection as a trade secret." ***WellSpan Health v. Bayliss***, 869 A.2d 990, 997 (Pa. Super. 2005).

Here, the trial court determined the worksheets and binders prepared by MJ Test Prep — a "compilation of admission test style questions with instructions on how to address the test problems successfully" — qualified as trade secrets. Trial Ct. Op. at 27. Furthermore, the court found MJ Test Prep took sufficient measures to "maintain confidentiality" of the information by marking the worksheets "'unauthorized reproduction prohibited' and telling tutors and students to maintain the confidentiality." *Id.* at 28.

Conversely, Appellants emphasize that the test questions utilized on the worksheets were derived from previous standardized tests, which are "available in bookstores and online." Appellants' Brief at 44. Further, Lynch testified that the method of grouping questions Joseph used in compiling his worksheets was a "ubiquitous method used to prepare students for the SAT" by other test prep companies, and by Lynch, himself, before he began working for MJ Test Prep. *Id.* at 44-45. *See* N.T. 9/24/19, at 42, 52. Appellants also maintain that Appellees did not take adequate measures to maintain the secrecy of worksheets because they were stored in open cubbies "easily accessible" to anyone, and were routinely handed out to students without requiring them to sign any nondisclosure or confidentiality agreements. *Id.* at 46-47. Indeed, Appellants insists "MJ Test Prep has no way of tracking, and does not track, whether any MJ Test Prep student shares the worksheets with other students." *Id.* at 47.

Our review of the record reveals ample support for the trial court's determination that the worksheets and materials prepared by Lynch for MJ

Test Prep constitute trade secrets pursuant to Section 5302. Although the test questions were easily accessible by individuals outside of MJ Test Prep, Joseph explained the unique method he used to compile the questions on MJ Test Prep's worksheets. *See* N.T., 9/18/19, at 60-67. He stated that he started tutoring for SAT prep in 1988, but began developing his system of teaching in 1996, when he changed the focus of his doctoral dissertation to "coaching for the SAT's." *Id.* at 52-54. Joseph explained:

> I initially developed [the system] when I was working on my PhD because in order to write a dissertation, you have to basically operationalize your approach. And so, what I did is I deconstructed the SAT and broke it into components of the test, discrete components that I could come up with solution strategies.
>
> * * *
>
> . . . So I could come up with solutions, so, I could come up with types of problems that would definitely show up. I broke those into categories. Then I broke that down into the simplest ways to teach those problems. . . . And so, in creating that system and seeing that operationalization, I also became more aware of what students needed help on what types of problems. So, when kids come to us, our system is adaptable in a sense that we can look at someone's needs and prescribe the right kind of materials.

*Id.* at 60-61. He testified that he looked for "broad categories" of question types, and "ways in which seemingly different questions fell under the same category." *Id.* at 63. Joseph summarized: "[W]hat I tried to do is . . . look categorically at the entire test, understand through my own deconstruction what I saw as the nature of these problems, broken into categories and then broke them into subcategories so they could easily be taught." *Id.* He noted that the sequence of the questions was "[e]xtremely" important to the

learning process. *Id.* at 95. Indeed, Appellees' witness, Matthew Tausch, testified that, when he began working for MJ Test Prep in July of 2019, he was "impressed" by the teaching system the company utilized, specifically the "level of understanding of the test" that the worksheets reflected. *Id.* at 36. He further stated that he was not aware of any other test prep company that used similar SAT worksheets. *Id.* at 51.

Joseph testified that had limited computer skills, so he instructed Lynch how to compile and group the questions for the worksheets, but would allow Lynch, under his direction, to type an explanation for the students. N.T., 9/18/19, at 93, 114, 127-28. While Lynch testified that he created a computer database of questions, which included his own method of "sorting [the] questions and determining . . . an appropriate order to present those questions in[,]" he acknowledged that the "last stage in that process was to show them to [Joseph] for his approval and occasionally he would suggest small tweaks[.]" N.T., 9/24/19, at 46-47. Despite Lynch's insistence that the worksheets were "almost completely [his] own work[,]" Joseph testified that he paid Lynch "a fee each week . . . simply to transcribe all the sort of ideas or visions for our business." N.T., 9/18/19, at 128; 9/24/19, at 47. The trial court resolved this credibility determination in favor of Appellants. *See Turner Const.*, 130 A.3d at 62.

With regard to confidentiality, Lynch conceded that all of the worksheets included a notice at the bottom, which stated "unauthorized reproduction prohibited," and that he, personally, added a copyright symbol to the

worksheets he created.[10]  N.T., 9/24/19, at 55-56.  Further, Joseph testified that he requires all of his tutors to sign a non-compete/non-disclosure agreement "so that people would not use the system . . . or divulge any of this information in a professional capacity to any other professionals[.]"  N.T., 9/18/19, at 130-31.  He also instructs MJ Test Prep tutors to emphasize to students who leave to work with another company that MJ Test Prep's materials "are intellectual property . . . not to be used with anyone else[.]"  *Id.* at 133.  While he acknowledged he has, 'in very limited cases," provided his materials to nonprofits groups or relatives free of charge, he has done so "with the provision that it's only used with a select group of people and they will not be reproduced or printed outside for anyone else to use."  *Id.* at 133.

Thus, the record supports the trial court's determination that Appellees' worksheets and other materials meet the "substantial secrecy and competitive value" test to qualify as trade secrets pursuant to Section 5302.  *See Crum*, 907 A.2d at 585.  Accordingly, Appellants are entitled to no relief on this claim.

In their final two issues, Appellants insist Appellees failed to establish the essential prerequisites for injunctive relief.  *See* Appellants' Brief at 49.  In particular, Appellants contend Appellees failed to demonstrate (1) they will suffer "irreparable harm" that cannot be cured by monetary damages; and (2) the three-year temporal restriction is reasonable.  *Id.* at 49, 54-55.

---

[10] Lynch also testified, however, that he "knew that there was no validity in that symbol[, t]hat it simply was the custom at MJ Test Prep when [he] arrived."  N.T., 9/24/19, at 57.

When reviewing a trial court's order grant of a preliminary injunction, we must bear in mind the following:

> [O]ur review of a trial court's order granting or denying preliminary injunctive relief is **"highly deferential"**. This "highly deferential" standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to "examine the record to determine if there were **any apparently reasonable grounds** for the action of the court below."
>
> "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused." "[W]e do not inquire into the merits of the controversy. . . . Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the trial court."

*Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 248–49 (Pa. Super. 2013) (citations omitted and emphases added). *See also AmQuip Crane Rental, LLC*, 199 A.3d at 913.

The party requesting preliminary injunctive relief has the burden of establishing each of the following "essential prerequisites" in order to obtain relief:

> The party must show: 1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or,

- 29 -

in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect the public interest."

***Warehime v. Warehime***, 860 A.2d 41, 46–47 (Pa. 2004).

Much of Appellants' argument is simply a rehash of claims that we have previously rejected. ***See*** Appellants' Brief at 49 (asserting there is no "enforceable agreement that contains enforceable restrictive covenants"); 52 (arguing the status quo prior to the lawsuit was that "the 2009 agreement was not in effect, MJ Test Prep was not a party to the agreement . . . , the materials created by Lynch while he was an independent contractor for MJ Test Prep belonged to him, [and] Appellees had no trade secrets or confidential information"); 53 (stating "Appellees did not establish . . . the existence of an enforceable agreement and protect[a]ble business interests."). Therefore, we need not address them again.

However, Appellants also assert that Appellees failed to demonstrate "the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages" and "the injunction . . . is reasonably suited to abate the offending activity." Appellants' Brief at 49, 54-55; ***see Warehime***, 860 A.2d at 46-47. Appellants emphasize Joseph's testimony that a "typical student at MJ Test Prep gets 15 sessions of tutoring over a 15-week period of time," for which the loss of income is an "easy mathematical calculation." Appellants' Brief at 50 (emphasis removed). Moreover, they maintain the trial court ignored this testimony, and speculated "without any supporting evidence" that MJ Test Prep may suffer future harm

because their SAT clients might seek additional test prep support in the future for graduate school exams. *Id.* Appellants aver: "Where, as here, there is an admission that customers use services for a finite period of time and that the loss of revenue from competition is easily calculated, irreparable harm is not established, and injunctive relief if no proper on that basis alone." *Id.* at 51. Similarly, Appellants insist the three-year temporal restriction is unreasonable because their "typical student . . . get 15 sessions of tutoring over a 15-week period." *Id.* at 54. Indeed, they maintain the three-year restriction is "designed to unfairly reduce competition." *Id.*

Our review of the record reveals "reasonable grounds" for the trial court's order granting Appellees' request for a preliminary injunction. *See Synthes USA Sales, LLC*, 83 A.3d at 249. Joseph testified that "most of [MJ Test Prep's] business is referral." N.T., 9/19/19, at 30. *See also* N.T., 9/18/19, at 57 (stating "[W]e're so well established in terms of raising scores and the system that we use [that b]asically, kids come to us because they know the results"). Joseph stated that, when discussing his business with a potential client,

> one of the things that we can say with great confidence is that we have a system of materials that no one else has that comprehensively cover[s] every component of the test and that if you come to us, you're going to be getting a research[ed] and well established system that is going to significantly raise scores.

N.T., 9/19/19, at 30-31. Moreover, he explained that he requires tutors to sign a three-year non-compete agreement because:

I believe that the system that we have is so powerful and so effective, that for anyone to use it within the immediate vicinity after working with us, would make them stronger than anybody else in the area and it would diminish what we do that's separate and special.

*Id.* at 126. *See also* N.T., 9/18/19, at 57-58 (noting his business "really took off" after the newspaper interviewed three students who received perfect SAT scores, and reported they had worked with him).

With regard to the immeasurable harm and three-year temporal restriction, the trial court opined:

> This Court notes that MJ Test Prep has been providing college admissions and professional tutoring services in the Philadelphia metropolitan area continuously since May 11, 2006. Over this period of time, customers have engaged MJ Test Prep for tutoring services for college admissions tests, many of whom received tutoring from [ ] Lynch directly through his work with MJ Test Prep. It is apparent that many individuals who pursue higher education often seek multiple degrees, each of which usually require an entrance exam. [A] customer is likely to return to a business that provided a satisfactory service in the past.

> The nature of the test prep business has inherent delay in when a repeat customer may solicit for additional services. . . . The traditional undergraduate degree takes students four (4) years to compete. If a student were to purchase SAT tutoring from MJ Test Prep, they are not likely to return for other graduate admissions test tutoring until they have completed all or a substantial portion of their undergraduate degree program.

> The goodwill that was developed by MJ Test Prep with its customers through offering testing service is the legitimate business interest they seek to protect. While the approximate value of services a single customer may seek from MJ Test Prep is reasonably predictable, it is unknown how many of MJ Test Prep's existing customers will require additional test prep tutoring . . . if they . . . seek to forward their scholastic careers[.] This makes the measure of potential lost revenue near impossible to determine.

Trial Ct. Op. at 25-26.

We agree. During cross-examination, Joseph acknowledged that if a student was tutored by MJ Test Prep for the SAT's before college, they would not return for graduate school tutoring until four years later. N.T., 9/19/19, at 125. Expanding on this testimony in a common-sense manner, the trial court determined that a three-year temporal restriction was reasonable to protect the goodwill of any repeat customers. Considering the bulk of Appellants' business is generated by word-of-mouth, we detect no abuse of discretion in the court's analysis.

Accordingly, bearing in mind our "highly deferential" standard of review, we find "reasonable grounds" in the record supporting the trial court's grant of a preliminary injunction in favor of Appellees.

Order affirmed.

President Judge Panella joins the memorandum.

Judge McLaughlin files a concurring memorandum in which President Judge Panella joins.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/21/21